STATE OF NORTH CAROLINA v. BENJAMIN CHAVIS, MARVIN
    PATRICK, CONNIE TINDALL, JERRY JACOBS, WILLIE EARL
    VEREEN, JAMES McKOY, REGINALD EPPS, WAYNE MOORE,
    JOE WRIGHT, AND ANN SHEPHARD

No. 745SC436

(Filed 18 December 1974)

1. Jury § 6— motion to sequester prospective jurors — pretrial publicity —
   statements by jurors

    In a prosecution for malicious damage to a store by use of fire
    bombs and for conspiracy to assault emergency personnel, the trial
    court did not err in the denial of defendants' motion to sequester the
    prospective jurors during *voir dire* examination because of pretrial
    publicity of the case where defendants presented no affidavits or
    exhibits to the court to establish a significant possibility that pre-
    trial publicity had exposed the jurors to potentially prejudicial ma-
    terial; nor did the court err in the denial of defendants' renewals of
    such motion when a prospective juror stated that he had formed an
    opinion as to the character of one of the defendants from what he
    had read and when another prospective juror stated that he had formed
    an opinion and had heard opinions formed about the case, since the
    statements by the prospective jurors did not indicate a situation in
    which there had been pretrial publicity which would expose the jurors
    to potentially prejudicial material.

2. Jury § 6— examination of prospective jurors — failure to object to
   question

    The trial court did not err in permitting the State to ask pros-
    pective jurors whether they felt any of the defendants had been un-
    fairly indicted where defendants did not object and except to the
    question.

3. Jury § 6— examination of prospective jurors — references to race

    Defendants were not prejudiced by the solicitor's reference to the
    race of certain persons in asking prospective jurors whether they
    knew such persons since the reference to race was a legitimate effort
    to aid in the identity of the persons named in the questions.

4. Jury § 6— examination of prospective jurors — waiver of objection

    Defendants waived their right to object to a question asked pros-
    pective jurors by the solicitor by failing to object when the question
    was asked on numerous occasions after the court sustained defendants'
    objection the first time the question was asked.

5. Jury § 6— examination of prospective jurors — membership in club ex-
   cluding blacks

    The trial court did not err in refusing to permit defense counsel
    to ask a prospective juror whether he had ever belonged to any club
    or organization which excluded black people from its membership.

State v. Chavis

6. Jury § 6— examination of prospective jurors — belief in racial equality

The trial court did not err in refusing to permit defense counsel to ask prospective jurors whether they believed in racial equality.

7. Jury § 6— examination of prospective jurors — tendency to convict blacks — error cured

Trial court's error in excluding a question by defense counsel as to whether any prospective jurors would more readily convict a person charged with crime because he is black than they would if he were some other color was cured when the court reversed its ruling and offered counsel the opportunity to restate the question.

8. Jury § 6— jury selection — rambling question permitted — subsequent exclusion of same question

Where the court permitted defense counsel to ask prospective jurors a question concerning acceptance of testimony by a police officer, the race of defendants and the victim, and membership in organizations advocating the supremacy of one race over another, although the question was objectionable for the reason that it was rambling, objection to the same inquiry immediately thereafter was properly sustained.

9. Jury § 6— jury selection — exclusion of question — question thereafter answered

Defendants cannot complain of the exclusion of a question to a prospective juror relating to the tenets of an organization to which the juror belonged where the objection was withdrawn and the juror thereafter answered the question.

10. Jury § 6— examination of prospective jurors — necessity for evidence to return not guilty verdict

The trial court did not err in refusing to permit defense counsel to ask a prospective juror whether he would have any hesitancy about saying defendants are not guilty if he had to decide the case without hearing any evidence or to ask another prospective juror whether it would take some evidence to overcome his adverse feelings toward defendants where counsel was given an adequate opportunity to inquire whether the jurors had formed opinions about the case, whether they harbored any prejudice against defendants, and otherwise to inquire into their fitness to serve as jurors.

11. Jury § 3— competency of jurors — discretion of court

The competency of jurors to serve is left largely to the sound legal discretion of the trial judge, and his rulings thereon are not subject to review on appeal unless accompanied by some imputed error of law.

12. Jury § 7— challenge for cause — preservation of exception to denial

In order for a defendant to preserve his exception to the court's denial of a challenge for cause, he must (1) excuse the challenged juror with a peremptory challenge, (2) exhaust his peremptory challenges before the panel is completed, and (3) thereafter seek, and be denied, peremptory challenge to another juror.

State v. Chavis

**13. Jury § 7—challenges for cause—prejudice or bias**

The trial court did not err in the denial of defendants' challenges for cause to prospective jurors on grounds of prejudice and bias where in each instance the juror portrayed no prejudice or bias or, upon examination by the court, stated unequivocally that he would be guided by the evidence, would require the State to produce evidence to convince him beyond a reasonable doubt of the guilt of defendants, and could be fair and impartial to both the State and defendants.

**14. Constitutional Law § 31—solicitor's notes on witness's statement—right of inspection—material evidence favorable to defense**

Defendants' rights of confrontation, due process and equal protection were not violated by the court's denial of their request to inspect a typewritten copy of a statement made by a State's witness containing handwritten notes added to the margin by the solicitor during a conversation with the witness, the original signed statement having been furnished to defendants, where the handwritten notes do not disclose material evidence favorable to the defense, and it is clear from an examination of the notes that the witness could not have known what the solicitor was writing and in no way could have acknowledged and adopted the notes as his statement or as a summary thereof.

**15. Criminal Law § 128; Witnesses § 1—witness advancing toward defense counsel—motions for mental examination, mistrial**

The trial court did not abuse its discretion in the denial of defendants' motions for a mental examination of a State's witness and for a mistrial when the witness, during unusually loud cross-examination by defense counsel, left the witness stand and attempted to reach the defense table.

**16. Criminal Law § 89—cross-examination—where witnesses housed during trial**

The trial court did not err in refusing to permit defense counsel to question two State's witnesses as to where they were being housed during the trial since the excluded answer did not disclose bias, interest, or a promise or hope of reward on the part of the witnesses.

**17. Criminal Law § 161—grouping of exceptions—one question of law**

All exceptions relating to the same question of law must be grouped under one assignment of error, and only those exceptions relating to the same question of law may be grouped under a single assignment of error.

**18. Criminal Law § 162—broadside assignment of error to evidence**

An assignment of error which states that defendants' several constitutional rights were violated "by admitting into evidence over defendants' objections testimony of witnesses for the State which was irrelevant, immaterial, incompetent, remote, prejudicial and inflammatory," and which thereafter lists by number 2,685 exceptions, is broadside and ineffective.

State v. Chavis

19. **Criminal Law § 87; Witnesses § 1— list of State's witnesses — competency of witnesses not listed**

In a case in which defendants filed a motion to compel the State to furnish them a list of prospective witnesses for the State and the solicitor voluntarily furnished defendants a list of the witnesses he proposed at that time to call, the trial court did not abuse its discretion in permitting the State to offer the testimony of witnesses not named on the list furnished by the solicitor.

20. **Criminal Law § 97— evidence offered by one defendant — rebuttal evidence adverse to all defendants**

In a prosecution of nine defendants for the felonious burning of a store and of one defendant for being an accessory before the fact to the felonious burning wherein only the defendant charged with being an accessory offered evidence, the trial court did not err in permitting a rebuttal witness for the State to give testimony adverse to the nine defendants who offered no evidence since the State's evidence against the accessory would necessarily involve the nine defendants who are charged with the actual burning, and since it was within the discretion of the court to permit the State to reopen its case against the nine defendants.

21. **Criminal Law § 128— juror's acquaintance with witness — motion for mistrial**

The trial court did not err in failing to order a mistrial when a juror stated that he knew a police officer who testified for the State.

22. **Criminal Law § 26— double jeopardy — continuance during jury selection — subsequent trial**

Where the assistant solicitor assigned to prosecute criminal charges became ill and was hospitalized during the jury selection process, and the trial court ordered that the trial of the cases be continued to a subsequent session, defendants were not placed in double jeopardy by their trial at a subsequent session since jeopardy did not attach at the first trial because the jury had not been sworn and empaneled.

23. **Criminal Law § 84; Searches and Seizures § 1— warrantless search of church — standing to object — trespassers — consent of church official**

In this prosecution for the felonious burning of a store and for conspiracy to assault emergency personnel, defendants had no standing to object to the warrantless search of a church and parsonage in which defendants allegedly held meetings before the crimes where they were not members of the church and were trespassers on the church premises; furthermore, the search was not unlawful since it was conducted with the permission of an official of the church.

24. **Property § 4— malicious injury to property by fire bomb — accessory before the fact — sufficiency of evidence**

The State's evidence was sufficient for the jury in a prosecution for being an accessory before the fact of the felonious burning of a store by use of fire bombs by nine other persons where it tended to

show that defendant was present in a church with the nine persons and others during the planning of the burning of the store, and that as weapons were being distributed to the group in preparation for the burning and an assault on emergency personnel who might come to the scene, defendant stated to the group, "I think it is right what you are doing. Y'all should show them you mean business."

ON writ of *certiorari* to review a trial before *Martin (Robert M.), Judge,* 11 September 1972 Session of Superior Court held in PENDER County. Argued in the Court of Appeals 29 August 1974.

Each of the ten named defendants was charged in bills of indictment with (1) the felony of burning Mike's Grocery Store building and contents in Wilmington, North Carolina, on 6 February 1971, by the use of fire bombs, which are explosives or incendiary devices (G.S. 14-49[b]), and with (2) the felony of conspiring to assault emergency personnel, law enforcement officers, and firemen with firearms (G.S. 14-288.9). The bills of indictment charging felonious burning with fire bombs were found true bills by the New Hanover County Grand Jury at the April 1972 Session. The bills of indictment charging the felonious conspiracy were found true bills by the New Hanover County Grand Jury at the May 1972 Session.

On 31 May 1972 defendants filed a motion for change of venue from New Hanover County upon the grounds of unfavorable pretrial publicity. On 1 June 1972 an order was entered transferring the cases against each of the ten defendants to Pender County for trial.

The cases were called for trial at the 5 June 1972 Session of Superior Court held in Pender County before Judge James. Without objection the cases were consolidated for trial, and the selection of a jury was commenced. After several days of jury selection, during which only three jurors were accepted and seated, the Assistant District Attorney (Solicitor) assigned to prosecute the cases became ill and was hospitalized. Upon motion of the State, the trial judge in his discretion continued the trial of the cases to a subsequent session. On 25 August 1972 the State filed a motion for jurors to be summoned from some county other than New Hanover or Pender. Defendants opposed the State's motion, and after a hearing on 31 August 1972 Judge Rouse entered an order denying the State's motion.

The cases were thereafter called for trial before Judge Martin in Pender County at the 11 September 1972 Session,

with a venire of jurors summoned from Pender County. The State announced that it elected to nol pros the cases of felonious burning and felonious conspiracy charged against the defendant Shephard and would prosecute her upon a bill of indictment, which was found a true bill by the New Hanover County Grand Jury at the August 1972 Session, charging defendant Shephard with the felony of being an accessory before the fact of the burning of Mike's Grocery Store by the use of fire bombs by the other nine defendants (G.S. 14-5 and G.S. 14-49[b]). Each defendant pleaded not guilty. The cases were again consolidated for trial without objection. Selection of a jury consumed over two weeks, and the report thereof covers 788 pages of the record on appeal.

The State offered in evidence a diagram (State's Exhibit No. 3) to illustrate the testimony of State's witnesses who described the area surrounding Mike's Grocery and Gregory Congregational Church. The diagram is reproduced on an accompanying page to portray the area. The State also offered in evidence (State's Exhibits Nos. 1 and 2) two aerial photographs taken of the same area after the events involved in these prosecutions. They were offered by the State to illustrate the testimony of State's witnesses who described the area surrounding Mike's Grocery and Gregory Congregational Church and to illustrate the testimony of the State's witnesses who described the extent of the burning of Mike's Grocery and the two adjoining residences.

The area described by the witnesses and illustrated by the diagram (reproduced on an accompanying page), and illustrated by the two aerial photographs, is inhabited primarily by persons of the Negro race. The owner of Mike's Grocery is Caucasian. The area of the primary activity is described by the witnesses is a two city block area bounded on the north by Ann Street, on the south by Nun Street, on the east by 7th Street, and on the west by 5th Street. Sixth (6th) Street runs between Ann Street and Nun Street is in the center of the two block area. Mike's Grocery is located on a corner, in the southwest quadrant formed by the intersection of Ann and 6th Street. The two houses that were burned, in addition to Mike's Grocery, were located on the west side of 6th Street, south of the location of Mike's Grocery. Gregory Congregational Church is on the north side of Nun Street, between 6th Street and 7th Street, near the intersection of Nun Street and 7th Street. The church rec-

tory is located on the north side of Nun Street just west of the church.

The State's further evidence tended to show the following: On Friday, 5 February 1971, approximately seventy-five to one hundred persons, ranging in age from about eight years and up, were gathered in and around Gregory Congregational Church on Nun Street. The ten defendants were present; some were armed with pistols, some with rifles, and some with shotguns. Some of the defendants, along with other persons, went into the backyard of the church where they made fire bombs by filling bottles with gasoline and inserting rags into the necks of the bottles to serve as fuses.

Defendant Chavis instructed defendant Patrick to pick eight or nine "brothers" and to do a good job of fire bombing Castle Street. Defendant Chavis also stated that later he would get some "brothers" together and fire bomb the Shop-Rite store on Greenfield Street because it was owned by white people. Later, at the direction of defendant Chavis, fifteen or twenty persons, some of whom were armed with guns, went to Dock Street where they threw bricks and shot at houses. On Friday night, 5 February 1971, fire bombs were thrown at Mike's Grocery Store, but they were extinguished by city firemen before extensive damage was done.

Again on Saturday, 6 February 1971, a group of seventy-five to one hundred persons, ranging in age from eight years and up, were gathered in and around Gregory Congregational Church. The ten defendants were present. At about seven o'clock p.m., defendants Chavis, Patrick, Tindall, and Shephard gathered in the church parsonage which was next door to Gregory Congregational Church. With them were the church's pastor and four or five other persons. Defendant Chavis stated that a white man lived in a house at the corner of Nun Street and 5th Street and that they should fire bomb the house and shoot the man when he came out. Defendant Chavis also stated that there had already been two attempts to burn Mike's Grocery Store and that he was going to make sure it was burned on the third attempt. Later defendants Chavis, Patrick, Tindall, and Shephard went next door to the Gregory Congregational Church. The other six defendants were already in the crowd gathered in the church. Defendant Chavis used the pulpit and the church public address system to tell the crowd that they were going to the corner of Nun Street and 5th Street to throw a fire bomb

State v. Chavis

in the house and shoot the white man when he came out. He told everyone who was large enough to use a gun to come with him. During this time defendant Chavis wore a .45 caliber automatic pistol in a belt holster. There were shotguns, rifles, and pistols stored near the front entrance to the church. Defendants Chavis and Patrick distributed guns to the other defendants. All of the defendants, except defendants Shephard and Epps, left the church together and went to the corner of Nun Street and 5th Street where a fire bomb was thrown at the house. At this time a police car drove to the side of the house, and the group which had come from the church started shooting at the two policemen in the car. When a second police car drove to the scene, the group retreated back to the church.

At about 9:30 p.m. on Saturday, with all of the ten defendants present in the crowd of seventy-five to one hundred people gathered in Gregory Congregational Church, defendant Chavis addressed them from the pulpit. Defendant Chavis explained to the crowd the "Chicago Strategy" as an action by which the group would set fire to a building and would hide in ambush to shoot the police and firemen when they came to the scene. He told them that Mike's Grocery "was run by a white man in a black section and that he thought that we should be getting the percentage of what Mike made in the black neighborhood. He think (sic) he should be donating so much money to us and that he wasn't and that (sic) for us to burn it down." He told the crowd to shoot and to kill the policemen who came to the fire at Mike's Grocery.

Defendant Chavis further told the crowd that he was going to have someone check the change of shifts at the police station so they could blow up the station. He stated: "[W]e were going to show these crackers that we mean business." One George Kirby, who was present in the church, went to the pulpit and told the crowd: "Get one of the pigs for me." Ann Shephard, one of the ten defendants, went to the pulpit and addressed the crowd, saying, "I think it is right what you all are doing. Y'all should show them you mean business."

Defendant Chavis and the State's witness Allen Hall then went to 6th Street to see if police were in the area. They did not see any policemen, and they went back to the church. Defendant Chavis told the group that was prepared to go burn Mike's Grocery "to come on." All of the defendants, except Ann Shephard, came out of the church with firearms. The

State's witness Allen Hall, one Steve Corbett, and fifteen or more others were with the defendants who assembled outside the church. Hall was armed with a pistol, and Corbett was armed with a shotgun. Defendant Chavis led the group to the backyard of the church where fire bombs were distributed. The group, which included all of the defendants except Ann Shephard, then walked from the back of the church along a path cutting through the block, ending between two houses across the street from Mike's Grocery. Defendant Chavis told the others in the group to "get into position and to stay there until Mike's Grocery started burning and then when the cops pull up into the area to start shooting." Some of the group were stationed back of Mike's Grocery, and some were stationed across the street. Defendant Chavis instructed each to use the password "rabbit" when they moved so they would not shoot each other.

Upon a signal by defendant Chavis, the defendants Patrick, Jacobs, McKoy, and Tindall threw fire bombs into Mike's Grocery Store building. Some were thrown through the upstairs windows, and some were thrown through the downstairs windows. They then positioned themselves in a wooded area behind Mike's Grocery. After the building began to burn, defendant Chavis and the State's witness Allen Hall went back to the church. When firemen and policemen came to the scene of the fire, the group (including all defendants except Chavis, who had returned to the church, and Shephard, who had remained in the church), which was waiting in ambush, opened fire upon the firemen and policemen with pistols, rifles, and shotguns. During this time one of the group, Steve Corbett, was fatally shot by a police officer as Corbett undertook to fire his shotgun, point-blank, at the officer. The shooting by defendants and their group was so intense that the firemen were unable to control the flames, and, as a result, Mike's Grocery Store and two separate residences were totally consumed by fire. By about midnight all of the defendants returned to Gregory Congregational Church.

On Monday morning, 8 February 1971, police officers, supported by a unit of the Army National Guard, went to Gregory Congregational Church to execute a search. In the belfry of the church were found several chairs facing the windows of the belfry, and several spent gun shell casings were on the floor. In the basement of the church were found spent shotgun shell casings, spent revolver shell casings, empty ammunition boxes,

some ammunition, several sticks of dynamite, and some blasting caps. In the backyard of the church, in front of the church, and in front of the parsonage was found spent ammunition. A search of the parsonage disclosed that on the dining room table was a large assortment of surgical and medical supplies and instruments. Ammunition boxes were also found in the dining room. The defendants were not identified as being in or around the church and parsonage when the police and Army National Guard arrived. The church's pastor and his wife had vacated the parsonage.

Nine defendants offered no evidence. The defendant Ann Shephard offered evidence which tended to show the following: She is not a member of Gregory Congregational Church. She was working with the Human Relations Council and first went to Gregory Congregational Church on Thursday afternoon, 4 February 1971, after she learned that a large group of people were meeting there. She went to the church because the group gathered there needed an adult in charge. The young people at the church were upset, and she tried to keep them calm. She spent Thursday night, all day Friday, and Friday night in the church, but she went home on Saturday morning and did not get back to the church until Sunday morning. While she was in the church, some of the defendants were also there. At one time on Friday she saw some guns. There were no speeches about the "Chicago Strategy" while she was there. There were no fire bombs while she was there. At no time did she tell the group: "I think it is right what you are doing. Y'all should show them that you mean business." She never heard anyone talk about using fire bombs on Mike's Grocery.

The jury returned verdicts of guilty as charged as to each defendant. Judgment of confinement was entered in each case. Each of the ten defendants appealed.

*Attorney General Carson, by Assistant Attorney General Hensey and Associate Attorneys Archie W. Anders and C. Diederich Heidgerd, for the State.*

*Mathias P. Hunoval, for the defendant Shephard.*

*Chambers, Stein, Ferguson & Lanning, by James E. Ferguson, II, for the other nine defendants.*

BROCK, Chief Judge.

[1]   Defendants first argue their assignment of error number IX. This assignment of error is addressed to the denial of their motion to have the jurors sequestered and to have each prospective juror examined on *voir dire* outside the presence of the selected jurors and prospective jurors.

The record on appeal discloses that counsel filed such a motion in writing with Judge James at the 5 June 1972 Session. No affidavits or exhibits reflecting adverse pretrial publicity are attached to the motion. The record on appeal discloses that the motion was denied by Judge James at the 5 June 1972 Session sometime before a continuance was ordered because of the illness of the Assistant District Attorney. Counsel's effort to assign error to the ruling made by Judge James is ineffective because Judge Martin was free to exercise his discretion upon the question of sequestering the jurors in the trial over which he presided, irrespective of how Judge James ruled upon the question in the proceedings over which he presided.

In the trial proceedings from which this appeal is perfected, the index to the record on appeal, as prepared by defense counsel, does not indicate that a written motion to sequester the jurors was filed with Judge Martin. However, this assignment of error (number IX) also refers to exceptions number 36, 429, 462, 505, and 506.

Exception number 36 is taken to the denial of an oral motion made by defendants as follows:

"MR. FERGUSON: We also filed a motion to sequester the jurors during voir dire examination because of the publicity that these charges have had throughout the State of North Carolina. In order to minimize influence and prejudice among jurors that if jurors were called to the box one at a time and examined out of the hearing of other jurors, we would be making a step towards assuring a fair trial for both sides. We would renew that motion and ask the Court that no jurors be present in the courtroom except the jurors examined on voir dire.

THE COURT: MOTION DENIED."

Counsel's statement that the charges against these defendants had been the subject of widespread publicity throughout the

State of North Carolina is mere allegation or, at best, a con-
clusion by counsel. The statement does not suggest the type of
publicity, nor does it suggest how any such publicity might be
prejudicial to defendants. There were no affidavits or exhibits
presented to the court to establish a significant possibility that
pretrial publicity had exposed the jurors to potentially prej-
udicial material. The trial judge in these cases was not a resident
of the area in which the trial was held. He resided in High
Point, Guilford County, North Carolina, which is some one hun-
dred and seventy-five miles from the scene of the alleged
offenses. We do not suggest that a trial judge is required to
take judicial notice of pre-trial publicity when he is a resident
of the area in which an offense occurs. We merely point out
that if defendants were genuinely concerned that pretrial pub-
licity had exposed the jurors to potentially prejudicial material,
they should have presented samples of such publicity to the
trial judge for his consideration. The motion was addressed to
the sound discretion of the trial judge. *State v. Jarrette*, 284
N.C. 625, 202 S.E. 2d 721. No abuse of discretion has been shown
in its denial.

Exception number 429 is taken to the denial of an oral
motion to sequester the jurors made by defendants while the
District Attorney was examining a prospective juror as follows:

"Q. Let me ask you this. Have you heard or read any-
thing with regard to any of these defendants in connection
with these particular charges?

A. No, not these particular charges, no.

Q. And as a result of anything that you have read
or heard have you formed any impression since you don't
know anything that has gone on and you only have what
you have read or heard to rely on, have you formed any
impression about any particular or any of these defendants?

A. I have formed an opinion as to the character of one
of the defendants.

Q. You have?

A. Yes, sir. That is as a result of what I have read.
It is not the result of any other source of information. Just
what I have read.

Q. As a result of that impression you have of that particular defendant, do think it would have any bearing at all in what your verdict might be in this case on the basis of the evidence that will be presented here?

A. If I had a difficult time in reaching a verdict it just might possibly help me to in reaching a verdict, maybe, just might possibly. I am saying that the impression I have is an unfavorable one toward the defendant. I don't know the defendant personally. I have seen his picture.

Q. You have never seen him personally?

A. No.

MR. FERGUSON: OBJECTION. We renew our motion to sequester the jurors on the voir dire examination.

THE COURT: OVERRULED. DENIED."

Clearly this prospective juror had not been influenced by pretrial publicity concerning the charges for which defendants were on trial. Although the juror stated that he had formed an opinion as to the character of one of the defendants, he stated that he had not heard or read anything about these particular charges. He did not state what had influenced him to form an opinion, what the opinion was, or of which defendant he had formed an opinion. Clearly the examination of this prospective juror did not disclose a situation in which there had been pretrial publicity concerning these charges which would expose the jurors to potentially prejudicial material.

Exception number 462 is taken to the denial of an oral motion to sequester the jurors made by defendants while the District Attorney was examining a prospective juror as follows:

"Q. Do you realize that anyone who will serve on the jury in this case will be required by the law to render their verdict only on the basis of the evidence that is presented here under oath here in this courtroom. Do you understand that?

A. Yes.

Q. Only on that evidence and on no other factor. Do you understand that?

A. Yes.

Q. Would you be able to do that?

A. Well, I think maybe I could. I don't know. I have formed opinions and heard opinions formed about it. I don't know whether it would have any effect on me or not.

Q. Opinions about what, sir?

A. About this case.

Q. What about this case?

MR. FERGUSON: OBJECTION.

THE COURT: OVERRULED.

A. The case that is being tried here.

Q. You have an opinion as to the case that is being tried here?

A. Yes.

MR. FERGUSON: OBJECTION; we renew our motion to sequester the remaining panel.

THE COURT: OVERRULED."

This prospective juror had not expressed an opinion adverse to the defendants. Nor did this juror indicate a situation in which there had been pretrial publicity which would expose the jurors to potentially prejudicial material.

Exceptions number 505 and 506 are taken to the action of the court in sustaining the District Attorney's objections to examination of a prospective juror by counsel for defendant Shephard. The questions propounded and the rulings thereon are in no way related to defendants' motion to sequester.

In *State v. Jarrette*, 284 N.C. 625, 202 S.E. 2d 721, the defendant raised the issue of the sequestration of prospective jurors. In *Jarrette* the Supreme Court held:

"The defendant next moved, prior to trial, that prospective jurors be questioned separately, out of the presence of other selected or prospective jurors. The ground was that this would avoid possibility that a prospective juror, in response to a question, might refer, in the presence of other prospective or previously selected jurors, to what he had read or heard through the news media concerning the

State v. Chavis

defendant's being an escaped prisoner. This motion also was directed to the sound discretion of the trial judge. [Citations omitted.] There was no abuse of discretion in its denial." 284 N.C. at 637.

Defendants have argued at great length that we should adopt the recommendation of the "American Bar Association Standards Relating to Fair Trial and Free Press," which reads as follows:

"Selecting the Jury.

It is recommended that the following standards be adopted in each jurisdiction to govern the selection of a jury in those criminal cases in which questions of possible prejudice are raised.

"(a) Method of Examination.

Wherever there is believed to be a significant possibility that individual talesmen will be ineligible to serve because of exposure to potentially prejudicial material, the examination of each juror with respect to his exposure shall take place outside the presence of other chosen and prospective jurors. . . ." A.B.A. Standards Relating To Fair Trial and Free Press, § 3.4 (1968).

Whether we agree or disagree with the foregoing recommendation has no effect upon defendants' appeal. The point is that in making their oral motion to sequester the jurors, defendants failed to present to Judge Martin evidence, if such evidence existed, from which he could form the belief that there was a significant possibility that individual talesmen would be ineligible to serve because of exposure to potentially prejudicial material. Judge Martin exercised his discretion in denying the motion, and no abuse of discretion has been shown.

We note certain other events regarding the talesmen summoned as prospective jurors. The defendants were indicted in New Hanover County and were originally scheduled for trial in that county. Upon motion by defendants the cases were removed to Pender County for trial. After the proceedings in these cases at the 5 June 1972 Session held in Pender County, the State made a motion that prospective jurors be summoned from a county other than New Hanover or Pender. Defendants resisted the motion, and the court ruled in favor of defendants. If defendants felt that jurors from Pender had been exposed to ma-

terial potentially prejudicial to defendants, they should have joined in the State's motion rather than resisting it. Assignment of error number IX is without merit and is overruled.

Defendants next argue their assignment of error number XI. By this assignment of error they contend that the trial judge permitted the State to propound improper questions to prospective jurors. Under this assignment of error they group two hundred and fifty-one exceptions.

Defendants concede that the regulation of the manner and the extent of the inquiry rests largely in the discretion of the trial judge. *See State v. Bryant,* 282 N.C. 92, 191 S.E. 2d 745. However, defendants argue that the trial judge exceeded the bounds of sound judicial discretion. We will examine the three arguments advanced by defendants under this assignment of error.

**[2]**  First, defendants argue that it was error for the trial judge to permit the State to ask the following question: "Have any of you at any time or do you now feel that any of these defendants have been unfairly indicted? Do any of you feel that way?" Defendants did not object to the question, and the trial judge made no ruling thereon. There is no exception, and it is therefore not the subject of an assignment of error by defendants. Their argument of the question on appeal is without merit.

**[3]**  Second, defendants argue that it was error for the trial judge to permit the State to make "constant references to race of persons during the questioning of jurors." In each of the instances to which defendants direct this argument, the District Attorney propounded the same series of questions to one or more prospective jurors. A clear example of the questions to which this argument is directed is as follows:

"Q. . . . . Now, did any of you know Steve Mitchell, also known as Steve Corbett who was a young black man who was killed on February 7 (sic), 1971, across the street from Mike's grocery store?

. . . .

"Q. Did any of you know him or his family? Do any of you know Mrs. Bell Fennell of Wilmington who was a black woman who owned a building two doors down from Mike's on February 6, 1971, when Mike's allegedly burned?

. . . .

"Q. Do any of you know Mr. or Mrs. James Jackson, a black couple who lived in that house owned by Mrs. Fennell?

. . . .

"Q. Do any of you know Mrs. McKeithan, a black woman of Wilmington who lived next door to Mike's grocery store?

. . . .

"Q. Any of you? Are any of you familiar with the area of 6th and Nun and 6th and Ann Street in Wilmington? Have any people or friends living in that area or have lived in that area in the past?"

Clearly the questions do not contain disparaging, derogatory, or inflamatory references to the race of anyone. They appear to be legitimate efforts on the part of the District Attorney to aid the jurors in determining whether they knew the persons named in his inquiry. The race of Steve Corbett, the young man who was killed during the night of 6 February 1971, was clearly and legitimately established by the evidence. The race of Mrs. McKeithan and Mrs. Jackson, who were called as witnesses for the State, became obvious to the jurors. It was obvious to the jurors that nine of the defendants are of the Negro race, and one, Ann Shephard, is Caucasian. We can see absolutely no prejudice to defendants by the questions to which they object. In fact the defendants did not object to the series of questions every time they were propounded. Defendants "blow hot and cold" upon the question of mentioning race in inquiries to jurors. During defendants' examination of jurors, the question of race was constantly considered. In any event, their argument upon the point is feckless.

[4] Third, defendants argue that it was error for the trial judge to permit the District Attorney to ask prospective jurors the following questions:

"Do you feel that there is any individual or group within our society that should not be required to obey the law as you and I are required to do?"

The entire venire of prospective jurors and those jurors who had been selected were in the courtroom at the times the question was asked. When the question was first asked, defendants objected, and their objection was sustained. Thereafter, the

State v. Chavis

same, or substantially the same, question was asked a second, third, fourth, and fifth time while examining a prospective juror, but defendants did not object. Apparently the defendants felt the asking of the question was not prejudicial to them. The sixth time the question was propounded, defendants objected and the objection was sustained. However, on the seventh and eighth occasions the question was asked, defendants did not object. Thereafter defendants at times did not object to the question, but, when they did object, their objection was overruled.

Without ruling upon the propriety of the challenged question, it seems clear that all of the selected jurors and prospective jurors had clearly heard the question, as it was repeatedly asked without objection from defendants. If the trial judge committed error in overruling the objections thereafter made, it seems clear that the error was not prejudicial because all the jurors had already heard the question asked and answered several times. In our view the defendants waived their right to belatedly object to the question by repeatedly failing to do so, particularly when the trial judge had ruled with them when they objected the first time the question was asked.

In our opinion there was no abuse of discretion on the part of the trial judge in his control of the manner and extent of the examination of the jurors by the District Attorney. Assignment of error number XI is overruled.

Defendants next argue their assignment of error number X. By this assignment of error they contend that the trial judge denied to them a full and effective inquiry into the fitness and impartiality of the prospective jurors. Under this assignment of error they group one hundred and five exceptions. Again we point out that the regulation of the manner and the extent of inquiry of prospective jurors rests largely in the discretion of the trial judge.

Basically this assignment of error argues that the defendants (nine of whom are of the Negro race) were entitled to inquire of prospective jurors if they harbored prejudice against members of the Negro race. Defendants argue that the trial judge would not permit such an inquiry. Defendants cite us to Aldridge v. U.S., 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054, a case arising from the District of Columbia, decided in 1931. Some sixty years before Aldridge, the Supreme Court of North Carolina, in State v. McAfee, 64 N.C. 339 (1870), held that

proper inquiries of prospective jurors upon the subject of prejudice against a race should be allowed. The Supreme Court of the United States, in *Aldridge,* relied, *inter alia,* on the holding of the North Carolina Supreme Court in *McAfee.* In *McAfee* counsel for defendant proposed to ask a juror if "he believed he could, as a juror, do equal and impartial justice between the State and a *colored* man," the defendant being a Negro. 64 N.C. at 339. Our Supreme Court held:

> "Any fact or circumstance may be given in evidence, tending to establish bias, partiality or prejudice, on either side. Not only may his declarations to others be shown, but a juror is bound to answer on oath, any question touching his competency, unless it tend to degrade him or render him infamous. It is essential to the purity of trial by jury, that every juror shall be free from bias. If his mind has been poisoned by prejudice of any kind, whether resulting from reason or passion, he is unfit to sit on a jury. Here, his Honor refused to allow a proper question to be put to the juror, in order to test his qualifications. Suppose the question had been allowed, and the juror had answered, that the state of his feelings towards the colored race was such that he could not show equal and impartial justice between the State and the prisoner, especially in charges of this character: it is at once seen that he would have been grossly unfit to sit in the jury box." 64 N.C. at 340.

Although we think the reason for the rule declared by the North Carolina Supreme Court over one hundred years ago and by the United States Supreme Court forty-four years ago has greatly dissipated and is far less compelling, the exercise of discretion by the trial judge nevertheless is subject to the essential demands of fairness. With these principles in mind we will examine the questions which defendants contend are examples of improper rulings by the trial judge.

The first question which defendants argue the jurors should have been permitted to answer was as follows:

> "Q. Now, ladies and gentlemen of the jury, it so happens in this case that nine of the defendants on trial are black persons. The store that they are charged with burning is owned by Mike Poulos, a white person in Wilmington. Let me ask first if any of you presently have any feelings of racial prejudice against black people. This is

would any of you more readily convict these persons because they are black than you would if they were white? Do any of you feel more strongly about this case because the person whose store was allegedly burned was white? All of you feel that you could put that out of your minds and not let it influence your verdicts one way or the other in the trial of this case? One of the defendants in this action, Mrs. Shephard, is white, young white lady. Does the fact that nine black men are charged along with one white woman give any of you any feelings about any of the defendants in this case which might be adverse to them or against them? Do any of you harbour any feelings of racial prejudice that you are aware of whatsoever? Have any of you ever belonged to any clubs or organizations which has as one of its tenets white supremacy?

SOL. STROUD: OBJECTION.

THE COURT: OBJECTION SUSTAINED."

Obviously the question, or series of questions, was so rambling and confusing that a juror should not have been expected to be able to give an intelligent answer. Clearly the trial judge was correct in sustaining the objection.

[5] The next question which defendants argue the jurors should have been permitted to answer was as follows:

"Q. Going back to Mr. Brown for a moment. I am sorry. What clubs or organizations in the community are you a member of, Mr. Brown?

A. I belong to the Burgaw Lions Club, Pender County Rescue Squad, American Legion, member of the Pender County Board of Education. I belong to several school groups. I belong to the Pender County Industrial Development Corporation. I have been a member of the Buckner Country Club, member of the Baptist Church. I am a Mason. That is all I can think of right off.

"Q. Have you ever belonged to any club or organization that excluded black people among its membership?

SOL. STROUD: OBJECTION.

COURT: SUSTAINED."

State v. Chavis

The juror had candidly and cooperatively answered as to every club and organization to which he belonged. The follow-up question, to which the objection was sustained, was probably impossible to answer. In any event it began to border upon harassment and bore no direct relation to the juror's prejudice, or lack thereof, against persons of the Negro race. Defendants have failed to show an abuse of discretion in this ruling, and we find none.

The next series of questions which defendants argue the jurors should have been permitted to answer was as follows:

"Q. Have any of you ever been victims of a damage to property? Has anyone ever damaged your property that you know of? Any of your property burned by anyone? It happens in this case, ladies and gentlemen, and again I am just asking for your honest answers, that the nine defendants I represent are young black men. The store that is alleged to have been burned was owned by a white man, Mike Poulos, in Wilmington. Does the race of the parties involved bother anyone? Does that give any of you any problems?

SOL. STROUD: OBJECTION.

COURT: OVERRULED.

"Q. And is anyone bothered by that fact? I am really asking you if anyone feels more sympathetic to one side in the case or the other because of that fact? Do all of you believe in racial equality?

SOL. STROUD: OBJECTION.

COURT: SUSTAINED.

"Q. Is there anyone on the jury who doesn't believe in racial equality?

MR. JOHNSON: OBJECTION.

COURT: SUSTAINED.

"Q. Would any of you more readily convict a person charged with a crime because he is black than you would if he was some other color?

SOL. STROUD: OBJECTION.

COURT: SUSTAINED."

[6, 7]   It should be noted that part of the first question of the series, although somewhat rambling and confusing, related directly to possible prejudice against persons of the Negro race. The trial judge overruled the objection. The next two questions of the series injected an inquiry about belief in racial equality. We think this type of inquiry does not address itself to possible prejudice against persons of defendants' race and was properly excluded. The last question of the series was a proper inquiry, and the trial judge was in error in sustaining the objection. However, immediately thereafter the trial judge corrected the error as follows:

"COURT: Mr. Ferguson, I am going to reverse myself on this question. Do you want me to have the Reporter read it back?

MR. FERGUSON: No, Your Honor.

COURT: Are you withdrawing that question?

MR. FERGUSON: I don't withdraw it.

COURT: Let the record show as to this last question that I have reversed my ruling. I am allowing counsel to ask that question. Counsel says he does not wish to ask that question at this time. The question was concerning conviction of blacks more so than other color."

The trial judge gave counsel the opportunity to propound the question, but for reasons known only to counsel, he declined. The trial judge promptly and unequivocally reversed his erroneous ruling and offered defendants the opportunity to restate the question. They cannot now be heard to complain. Irrespective of counsel's decision not to propound the question again at that time, the same question or questions of similar import were consistently permitted by the trial judge thereafter. We find no merit in defendants' argument upon this point.

[6]   The next question which defendants argue the jurors should have been permitted to answer was as follows:

"Q. Is there anyone on the jury now who does not believe in racial equality?

SOL. STROUD: OBJECTION.

COURT: SUSTAINED."

We have already stated that this type of inquiry is not properly directed to the question of possible prejudice against persons of defendants' race. We hold that the question was properly excluded.

The next question which defendants argue the jurors should have been permitted to answer was as follows:

> "Q. Have any of you belonged to any such organization? Have any of you ever had such feeling?
>
> SOL. STROUD: OBJECT.
>
> COURT: SUSTAINED."

The question standing alone is incomplete and incomprehensible. Objection was properly sustained. However, the question which immediately preceded it was as follows:

> "Q. Going now to all members of the panel you have heard it stated by the State that there will be several police officers testifying in this case. Now, I'd like for you to indicate by raising your hand those persons who would more readily accept what a police officer had to say about a matter than someone who was not a police officer simply because it is a police officer saying it? How many people have a feeling like that about police officers? Just indicate that to me by raising your hand. Now ladies and gentlemen, as you have seen, this case involves nine young men who happen to be black and one young lady who happens to be white. The store owner whose store was allegedly burned is white. Now, these facts that I have just related to you would they cause you to identify more with the State in the trial of this case than with the defendants or to feel more favorable toward the State than to the defendant? In other words, will the race of the parties involved affect your verdict in this case? Do you feel that it will? Let me just ask you this. Have any of you ever belonged to any kind of organization which had as one of its tenets the supremacy of one race or the other, the supremacy of whites over black?
>
> SOL. STROUD: OBJECTION.
>
> COURT: OVERRULED.

"Q. Have any of you belonged to any such organization? Have any of you ever had such feeling?

SOL. STROUD: OBJECT.

COURT: SUSTAINED."

[8]  Although the question was rambling and for that reason was objectionable, the trial judge nevertheless permitted it. Objection to the defendants' immediately making the same inquiry again was properly sustained.

[9]  The final question, or series of questions, touching upon possible prejudice against members of the Negro race, which defendants argue should have been permitted, appears as follows:

"Q. And you say the only organization that you have been affiliated with is the church?

A. I didn't say that. I was never asked that question. I am affiliated with the Masonic Lodge and the Woodmen of the World, Fraternal Life Insurance.

"Q. What are the basic tenets of that organization?

MR. FERGUSON: OBJECTION.

COURT: SUSTAINED.

Q. This is an ecological organization?

SOL. STROUD: OBJECTION.

A. Drag that by me again. I don't even know what the word means.

SOL. STROUD: We withdraw our objection.

"Q. Mr. Pate, would you please explain to us one or two of the basic tenets of this organization?

A. It is a life insurance company that has a social aspect on the local level. The office is Omaha, Nebraska. The headquarters; and mainly the purpose is to sell life insurance with a local camp having social activities. I don't know of anything else to compare it to because I don't belong to anything else. I am sure there are other things similar to this.

State v. Chavis

"Q. You don't view it as a politically conservative front or lobby for any cause?

A. No. The basic purpose of it is to sell life insurance, and I suppose anybody will use any gimmick they can to sell life insurance. There is nobody in my family by blood or marriage who is related to National Guardsmen or firemen.

"Q. You can't think of anything that would disqualify you for service?

A. I tried to think of everything I could. If I could think of anything else, I would."

Although an objection was at first sustained, the objection was withdrawn, and the answers by the juror were fully developed. It is not clear to us why counsel for defendants objected to one of the questions asked by co-counsel. The question was nevertheless pursued thereafter by defendants and answered by the juror. Defendants have absolutely no grounds to complain.

[10] Defendants next argue that the trial judge unduly restricted their inquiries to jurors by not permitting them to ask whether the jurors would require evidence before they would return a verdict of not guilty. Defendants direct our attention to twenty-one instances of the court's ruling upon the point.

At the opening of the jury selection proceedings, the trial judge instructed the prospective jurors upon their duties and upon the principle that the State had the burden to prove the guilt of defendants beyond a reasonable doubt, that defendants were presumed to be innocent, and that defendants had no burden of proof. The trial judge repeated his instruction upon these principles from time to time during the two weeks of jury selection.

In some instances a prospective juror answered that he had heard opinions expressed about the charges against defendants. The following is an example of the inquiry by defendants to which the State's objections were sustained:

"A. No. I would not be embarrassed to face the persons who expressed opinions to me if the State fails to satisfy me beyond a reasonable doubt that the defendants be guilty and I voted for not guilty. I work at Wallace Sewing Company. I do not belong to any clubs or organizations.

"Q. Having heard nothing by way of evidence in this case, if you had to decide the case without hearing any evidence now, would you have any hesitancy about saying the defendants are not guilty?

MR. JOHNSON: OBJECTION.

COURT: SUSTAINED.

I have instructed several times as to the presumption of innocence that surrounds everyone who is charged with an offense."

The question was hypothetical, confusing, and bordering upon an attempt to cross-examine the juror about the answer he had just given. The trial judge had the duty of restraining counsel from unnecessary, argumentative, and confusing examination of jurors.

In some instances a prospective juror answered that he had formed an opinion about the case. The following is an example of the inquiry by defendants to which the State's objection was sustained:

"A. I have feelings about the case. I understand what the charges are. I would consider the feelings that I have to be adverse to the defendants.

"Q. Do you feel like it would take some evidence to overcome the feelings?

SOL. JOHNSON: OBJECTION.

COURT: SUSTAINED."

The juror had answered clearly that she had feelings adverse to defendants. The question to which the objection was sustained was somewhat meaningless and most certainly confusing.

We have carefully examined each of the twenty-one instances of rulings which defendants contend denied them the opportunity to inquire whether a prospective juror would require evidence before returning a verdict of not guilty. The two instances set out above are adequate illustrations of the twenty-one instances.

In our opinion the defendants were given abundant and adequate opportunity to inquire whether the jurors had formed opinions about the case, whether the jurors harbored any preju-

---
State v. Chavis
---

dice against defendants, and otherwise to inquire into their fitness to serve as jurors. This assignment of error number X is without merit and is overruled.

Defendants next argue their assignment of error number XII. By this assignment of error they contend that the trial judge committed error in his refusal of their challenge for cause to certain jurors.

[11] By statute, G.S. 9-14, and in accord with general practice in state and federal courts, the presiding judge decides all questions as to the competency of jurors. The competency of jurors to serve is left largely to the sound legal discretion of the trial judge, and his rulings thereon are not subject to review on appeal unless accompanied by some imputed error of law. *State v. Johnson,* 280 N.C. 281, 185 S.E. 2d 698; *State v. Cameron,* 17 N.C. App. 229, 193 S.E. 2d 485; 47 Am. Jur. 2d *Jury* § 221. A ruling in respect to the impartiality of a juror presents no question of law for review. *State v. Johnson, supra.* "The right of challenge is not one to accept, but to reject. It is not given for the purpose of enabling the defendant, or the State, to pick a jury, but to secure an impartial one." *State v. English,* 164 N.C. 497, 507, 80 S.E. 72.

[12] The rule in this State is that in order for a defendant to preserve his exception to the court's denial of a challenge for cause, he must (1) excuse the challenged juror with a peremptory challenge, (2) exhaust his peremptory challenges before the panel is completed, and (3) thereafter seek, and be denied, peremptory challenge to an additional juror. *See State v. Allred,* 275 N.C. 554, 169 S.E. 2d 833. Defendants in this case have complied fully with the above rule and are entitled to have their exceptions to the court's denial of their challenges for cause examined.

[13] In this assignment of error defendants contend that the trial judge, on thirty occasions (they have grouped thirty exceptions), violated the ninth rule laid down in *State v. Levy,* 187 N.C. 581, 122 S.E. 386, as grounds for challenging a juror for cause:

> "9. If he be prejudiced or biased to such an extent that he cannot render a fair and impartial verdict in the case he would be disqualified on objection to sit as a juror." 187 N.C. at 586.

An examination of defendants' thirty exceptions to rulings on their challenges for cause discloses that on at least three of the occasions complained of, the trial judge actually allowed the challenge for cause. On one occasion, while examining one prospective juror, defendants undertook to challenge another juror for cause. No reason was developed for such a challenge. On at least two other of the occasions complained of, the defendants merely renewed motions for challenges for cause which had already been denied. It appears that defendants have unduly burdened and confused the record by inserting and arguing assignments of error to rulings of the trial judge which were favorable to defendants.

We have carefully reviewed the remaining rulings of which defendants complain. In each instance either the juror portrayed no prejudice or bias, or, upon examination by the trial judge, stated unequivocally that they would be guided by the evidence, would require the State to produce evidence to convince them beyond a reasonable doubt of the guilt of defendants, and could be fair and impartial to both the State and defendants. The trial judge's ruling with respect to the impartiality of the jurors, who defendants sought to challenge for cause, presents no reviewable question of law. *State v. DeGraffenreid,* 224 N.C. 517, 31 S.E. 2d 523. The trial judge hears the questions put to the juror and the answers given, observes the juror's demeanor while being interrogated, and discerns through the use of his eyes, ears, and intelligence wherein truth and credit should be given. A reviewing court does not have the benefit of this personal observation which is so important in judging the credibility of the juror. *See Leick v. People,* 136 Colo. 535, 322 P. 2d 674, *cert. denied,* 357 U.S. 922, 78 S.Ct. 1363, 2 L.Ed. 2d 1366. The trial judge's decision as to the impartiality of a juror will be reversed only where manifest abuse of discretion is shown. The trial judge in this case was considerate and patient with defendants and allowed them wide latitude in examining the prospective jurors. No abuse of discretion has been shown in the rulings upon defendants' challenges for cause. This assignment of error number XII is without merit and is overruled.

[14]    Defendants next argue their assignment of error number XX. By this assignment of error they contend that the trial judge denied their right of confrontation as guaranteed by the Sixth Amendment to the Constitution of the United States and Article 1, § 23 of the North Carolina Constitution; that the trial

judge denied their right to due process of law as guaranteed by the Fifth Amendment to the Constitution of the United States; and that the trial judge denied their rights to due process of law and equal protection of the law as guaranteed by the Fourteenth Amendment to the Constitution of the United States. They assert that the denial of these constitutionally protected rights of confrontation, due process, and equal protection were violated by the denial of their request to inspect what they contend was a written pretrial out-of-court statement by the State's witness Allen Hall.

On 30 May 1971 the State's witness Allen Hall signed a statement given to investigating officers concerning the events on 5 and 6 February 1971, which events gave rise to the charges against these defendants. On 18 February 1972 the State's witness Hall, who was then serving a prison sentence upon his plea of guilty to the same charges upon which these defendants were tried, gave a statement to investigating officers. This latter statement was typed and subsequently signed by the witness Hall on 2 March 1972. This latter statement was typed single-spaced and covers eight pages. Prior to trial the defendants were furnished with copies of these two written statements of the witness Hall. Allen Hall testified for the State at the preliminary hearing of the charges against these defendants, and a transcript of his testimony at that hearing was also furnished to defendants.

Upon trial, during cross-examination of the State's witness Allen Hall, he testified that during the month of March 1972, a week or two after he had signed the second written statement, he requested a conference with Solicitor Stroud to discuss the written statement. He testified that he and the Solicitor discussed the typewritten statement and discussed the entire case. He testified that he observed the Solicitor making notes on the margin of the Solicitor's copy of the typewritten statement during their conversation; that he did not read the notations made by the Solicitor; and that he did not sign the Solicitor's copy with the notations on it. The testimony of Allen Hall which is most pertinent to this question was as follows:

"Q. Are you saying at this time that you never did make all those statements and all those additions and corrections to Mr. Stroud in March of 1972?

A. You told me—you said a statement—

State v. Chavis

"Q. All right.

A. You said statement—which I did not make a statement. I just told them what I had left out, what I had told them. He put that in there, but didn't make no statement.

"Q. Did you ever see that statement that Mr. Stroud prepared?

A. He haven't prepared no statement to my knowledge. He just filled in. Whenever I talked to him he just wrote it on his statement where I had in February 18, but I haven't seen none of the statement. I saw the statement whenever we was together, whenever he was filling it in.

"Q. So you have seen the statement that Mr. Stroud— that you say Mr. Stroud has after he made all the additions and corrections to it?

A. It is the same statement. It is not narry new statement. It is the same statement, but it is the one he put the additions onto. I remember that. I remember seeing the statement where he had of mine where he put the addition on where I had gave him February 18, 1972. That statement is my final statement as to all events that took place. That is my statement just like that first statement is my statement.

"Q. And that second statement is also your statement?

A. Yes, sir.

SOL. STROUD: OBJECTION, Your Honor.

"Q. And you have adopted all the handwritten notations Mr. Stroud put in that statement you gave him on February 18, 1972?

SOL. STROUD: OBJECTION.

COURT: SUSTAINED.

"Q. Is there anything in that second statement as amended that is not a product of your mind?

SOL. JOHNSON: OBJECTION.

COURT: SUSTAINED.

State v. Chavis

"Q. Are there any notations on that second statement put on there by Mr. Stroud that you did not tell him to put on there?

A. No, sir; there isn't anything on the statement that I didn't say put on there what Mr. Stroud put on the statement was my addition to the statement was mine, and he did not add nothing to the statement.

"Q. And every single thing that is on that statement that you saw as amended and as supplemented is your statement?

A. Yes, sir.

SOL. STROUD: OBJECT.

MR. HUNOVAL: Your Honor, I move again for the State of North Carolina to produce Allen Hall's statement.

SOL. STROUD: Your Honor, may we approach the bench?

MR. FERGUSON: I join that motion, Your Honor. (Conference at the bench.)

COURT: Motion denied.

"Q. Mr. Hall, on that statement that was amended by Mr. Stroud, everything on that statement is something that you told him to put down. Isn't that correct?

SOL. JOHNSON: OBJECTION; been over it.

COURT: OVERRULED. Go ahead.

A. Whenever Mr. Stroud come—came rather, he brought his statement with him. I told him what was left out of the statement, and I told him about some of the things that was misplaced in wrong parts on the statement; and so he wrote them down on his statement on the sides of his statement. What he wrote down is what I told him to write down."

The statement of the Solicitor to the court pertinent to this question and the colloquy of counsel were as follows:

"MR. FERGUSON: If your Honor please, at this time the defendants move that we be given a copy of the amended statement made by Allen Hall by that we are referring to the statement or the additions and/or corrections made

to the statement in Lumberton after Mr. Stroud went to Lumberton at the witness's request and conferred with him about the statement that the witness had signed.

THE COURT: All right, Mr. Solicitor.

SOLICITOR STROUD: I'd like to put something in the record at this time.

MR. HUNOVAL: Your Honor, I'd like to join in that motion. I think clearly Mr. Hall incorporated by reference the written statement, and I don't believe it is the work product of the Solicitor's office. He said it was his statement. The mere fact he never signed it should not prevent us from procuring it.

MR. FERGUSON: If I recall we said he said he had already signed the statement and he incorporated these additions.

SOLICITOR STROUD: The word incorporated, particularly incorporated by reference is a word Mr. Hunoval uses a great deal. I don't recall the witness saying he incorporated. As I recall what the witness testified to he said everything he's testified to here in court he had told the detectives, Bill Walden and myself in the interview at Cherry Hospital. Then there was a typed statement made, presented to him. At that time he did not make any additions or corrections to it. He signed it. Less than a week later I was notified to come to Lumberton to talk with him about his statement. I went to Lumberton. I took a copy of the typed statement that he had signed and during the time that I talked with him concerning his activities on February 5 and 6, 1971, at Lumberton he stated things that he had previously stated at Cherry Hospital which were not in the typewritten statement. And so at that time on my copy of the statement I made certain additions in ink in my own handwriting. Mr. Hall at that time did not initial or sign those additions that had been made in the typewritten statement. This was solely for my benefit, for my use as a Solicitor prosecuting the case. I contend that I, having given the signed typewritten statement to the defense attorney which they have in their presence and which they have cross-examined Mr. Hall about, is what they requested. They requested his signed statement and that is what I gave them. That any notes that

State v. Chavis

were made after he signed that statement were work products of my office in.my position and that I am not obligated under law to let them have my notes.

"THE COURT: Anything from you, Mr. Johnson?

SOLICITOR JOHNSON: No, sir.

THE COURT: Are you asking for the notes of Mr. Stroud on his copy of the statement?

MR. FERGUSON: Well, no, sir; we are not asking for Mr. Stroud's notes as any notes that are his work product. What we are asking for—

THE COURT: He says that there is not any other statement that you know of? (To Solicitor Stroud.)

SOLICITOR STROUD: Right.

"MR. FERGUSON: We are asking for the statement which includes the handwriting Mr. Stroud added to which the witness says that was a part of the statement.

THE COURT: The Solicitor said that was a part of his work product of his office.

MR. FERGUSON: Your Honor, here is my point. If what Mr. Stroud is saying is anything that the witness himself didn't write on there is work product, then the whole statement would be work product. That is not his writing. That is not his typing. He made a statement he said Mr. Stroud was the main note taker and at some point in March Mr. Walden took this statement up to him to sign. Then following that he summoned Mr. Stroud up to Lumberton because he wanted to make additions to the statement that he made. He said he was concerned because he hadn't included some things on there. I don't think what Mr. Stroud wrote on in handwriting is anymore work product than what the statement said."

The trial judge examined, *in camera,* the Solicitor's copy of the 18 February 1972 typewritten statement of the witness Allen Hall with the Solicitor's notes thereon. He denied defendants' motion with the following order:

"COURT: On the motion of the defendants for the production of a statement, amended statement, by Allen

Hall the Court has examined a copy of what purports to be a statement of Allen Hall, which copy is unsigned and which copy contains numerous handwritten notes, all of which the Court understands is in the handwriting of the Solicitor; that these handwritten notes appear on the margin of what purports to be a typewritten copy of a statement by Allen Hall. The handwritten notes are not complete in many instances. There are some notations which are stricken and crossed out. Some of the notes the Court is unable to read because the same have either been stricken or otherwise obliterated; that the notes do not make a complete statement in any respect.

"There is no signature or initial by the witness Hall; that these papers consisting of eight pages was examined by the Court while the witness was still available for cross-examination and has been examined by the Court again this date, and the Court is of the opinion that such notations are the Solicitor's own work, his own handwriting, that they do not amount to a statement by the defendant—I mean, by the witness Hall, and that they are the work product of the Solicitor and that the defendants are not entitled to these notes."

Thereafter the trial judge ordered the paper writing to be impounded and sealed in the files of the clerk of court for use on appellate review. We ordered the paper writing to be certified to this Court for *in camera* examination. This Court has examined the paper writing in detail.

The common law does not recognize a right of discovery in criminal cases. *State v. Goldberg*, 261 N.C. 181, 134 S.E. 2d 334, *cert. denied*, 377 U.S. 978, 84 S.Ct. 1884, 12 L.Ed. 2d 747 (1964). In 1967 G.S. 15-155.4 was enacted. This statute provides that a pre-trial order may require the solicitor, upon demand, to produce for inspection and copy specifically identified exhibits to be used in the trial. Obviously defendants do not assert rights under this statute. Instead they seem to argue, in part, that the rule of *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed. 2d 1103 (1957), should apply. It seems clear that the decision in *Jencks* does not involve a constitutional question, but established a rule of procedure to be applied in federal criminal prosecutions. Annot., 7 A.L.R. 3rd 181, § 5[b] (1966). This view is supported by the fact that the rule was later substantially

adopted by statute (18 U.S.C. § 3500). Since the adoption of that statute, the production of a government witness' statement is governed by the statute. Annot., 7 A.L.R. 3rd 181, § 17 (1966).

Defendants rely also upon the holding in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed 2d 215 (1963). In *Brady* the Supreme Court used the following language:

"We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.

However, the Supreme Court has also declared: "We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." *Moore v. Illinois*, 408 U.S. 786, 795, 92 S.Ct. 2562, 33 L.Ed. 2d 706, *reh. denied,* 409 U.S. 897, 93 S.Ct. 87, 34 L.Ed. 2d 155 (1972).

The Supreme Court of North Carolina has recently applied the holding in *Brady v. Maryland, supra,* as follows: "The standards enunciated in *Brady* by which the solicitor's conduct in this case is to be measured require us to determine whether there was (a) suppression by the prosecution after a request by the defense (b) of material evidence (c) favorable to the defense." *State v. Gaines,* 283 N.C. 33, 45, 194 S.E. 2d 839 (1973). The Court noted that obviously the suppression would not be error unless the suppressed evidence was favorable to the defense.

[14] Our examination of the handwritten notes appearing along the margins of the copy of the typewritten statement of the witness Hall does not disclose material evidence favorable to the defense of these defendants. We agree with the observation of the trial judge that, on the whole, the notes do not make complete statements or sentences or thoughts. Most of them are obviously meaningless to anyone except as a signal of a thought for the maker of the notation, in this instance the Solicitor. Despite the foregoing testimony finally elicited from Allen Hall by the prolonged and probing cross-examination conducted by astute counsel for defendants, it is clear from an examination of the marginal notes that, even under the federal rule of procedure, the witness Hall could not have known what the Solicitor was writing and in no way could he have acknowledged and

adopted the marginal notes as his statement or as a summary thereof.

The trial judge exercised his sound discretion in refusing defendants' request for the copy of the typewritten statement with the Solicitor's marginal notations and in keeping the cross-examination within reasonable bounds. We find no abuse of discretion in this restriction. This assignment of error is over-ruled.

[15]  Defendants next argue their assignment of error number XXVI. By this assignment of error they contend that the trial judge committed error by expressing an opinion and by refusing to allow defendants' motion for a mistrial. This argument is directed to the reaction of the witness Allen Hall to defense counsel's cross-examination concerning the exact times of certain events and the exact distances to certain places.

The record on appeal discloses the following cross-examination by defense counsel leading up to the conduct of the witness Allen Hall of which defendants now complain:

"A. Marva Jacobs. That is M-A-R-V-A, a girl. I went around to talk to her. I talked to Marva Jacobs just a few minutes because she was getting ready to go somewhere. When I left at the time I went around the corner, I was not looking for Marva Jacobs, I was, you know, I was going to my cousin's house.

Q. What cousin?

A. My cousin.

SOLICITOR STROUD: OBJECTION, your Honor. He doesn't have to shout.

MR. FERGUSON: Your Honor, I asked him what cousin and he won't tell me what cousin.

THE COURT: Gentlemen, keep your voices down. Go ahead and answer the question.

A. Gwen's house. I did not go to Gwen's house on Friday night. Friday afternoon. I said I had started around there. You asked me where I was headed. I said Gwen's house. I met Marva, a friend. I talked to her a few minutes, and I came back to Rev. Templeton's house. I did not continue to go around to Gwen Carrol's house.

Q. What stopped you from going to her house?

SOLICITOR STROUD: OBJECTION.

THE COURT: OBJECTION SUSTAINED.

Q. Why didn't you go to her house?

SOLICITOR STROUD: OBJECTION.

THE COURT: OVERRULED.

A. Because after I had talked to Marva then I just said to myself, 'Well, I ain't got time to go to Gwen's house. I'll catch her later.' I hadn't talked to Marva but a couple of minutes.

Q. All of a sudden after a couple of minutes you found you didn't have time to go to Gwen's house?

A. Mr. Ferguson, it doesn't take an hour or two for a mind to change. A person can realize he might not have that much time as far as what is going on at the church. I said I had to make it back to the church because I told Ben Chavis I'd be back in a few minutes, not an hour and 30 minutes.

Q. What were you going to go to Gwen's house for to start with?

SOLICITOR STROUD: OBJECTION.

THE COURT: OVERRULED.

A. Just going to talk; just to conversate. I didn't go because I thought it was more important to come back to the church. I left there and came back to Rev. Templeton's house. I am not sure what time it was when I got back to Rev. Templeton's house. Whenever I got to Rev. Templeton's house then me and Ben Chavis talked. That is whenever Ben Chavis carried me upstairs where he was staying at Rev. Templeton's house. That is where he told me he was going to show the crackers we mean business. He was going to make the crackers beg. He was going to get us what we want no matter what it takes. He was playing the Chicago Strategy. He asked me had I ever heard of the Chicago Strategy. I told him no. He asked me had I ever been to Chicago.

Q. You didn't even intend to answer my question.

SOLICITOR STROUD: OBJECT. He is answering.

MR. FERGUSON: Your Honor, he is not answering my questions.

A. You asked me whenever I came back talking to Marva where did I go then, and I told you to Rev. Templeton's house, and then you said where, then I said upstairs with Ben Chavis.

Q. That was the answer to my question. How long did you stay up there?

A. Maybe 30 minutes. Ben Chavis and Jim Grant were up there with me. Just the three of us stayed upstairs 30 minutes. I can't say for sure who was downstairs while we were upstairs.

Q. When you left upstairs and went back downstairs what time was it?

A. I don't know for sure. I don't have any idea because I didn't have a watch. When I got back downstairs I stayed in the house not too long.

Q. What do you call not too long?

A. That is whenever Chavis started talking about we needed some gasoline to make firebombs.

Q. How long did you talk about that?

A. Well, you know, he just said we needed gasoline to make firebombs in order to burn some of the big business in Wilmington.

Q. Who was present at that time?

A. Molly Hicks, Tom Houston, George Kirby. Then John Robinson came into the door and Patricia Rhodes, Connie Tyndall, Benjamin Wonce, Annie McLean, Jim Grant and some others I don't know. I don't know who the others were who came in right off-hand.

Q. How long did you talk to Allen Hall (sic)?

A. I don't know, Mr. Ferguson.

Q. Was it an hour?

A. I don't know, Mr. Ferguson.

Q. Was it a half hour?

SOLICITOR STROUD: OBJECTION.

THE COURT: SUSTAINED.

He said he didn't know.

A. No one left before I left.

Q. You were the first one to leave?

A. Myself, Chavis, John Robinson, Jim Grant and another dude left to get the gasoline and the bullets at Sears.

Q. All of you left to go get the gasoline and bullets at Sears?

A. Not all of us. Just us five and Marvin Patrick. That was me, Chavis, Grant, Robinson and another dude I don't know. That is five right there. Nobody else went with us. That is when I left and went out on Oleander Drive.

Q. What time was it when you arrived out at Fields on Oleander Drive? Is that where you say you went?

A. Yes, sir.

Q. What time was it when you arrived?

A. I can't say because I don't know what time it was. It was dust dark.

Q. How long did you stay out there?

A. I can't say right offhand, Mr. Ferguson, because I didn't time the time we got to Fields. I didn't time the time we had a conversation with the cashier. I didn't time the time whenever we left. I can't say what time it was.

Q. You don't have any idea in the world what time it was?

SOLICITOR JOHNSON: OBJECTION.

THE COURT: SUSTAINED.

When we left there then we went to the filling station to get some gasoline. We were at the filling station getting

gasoline just long enough to get the gasoline. I went in the store first. I went to the soda machine to get some soda. Then I went inside the filling station to get some candy. Then Chavis paid the service station and then the dude came back and brought the change and then we left.

Q. How far is Oleander Drive from 6th and Nun?

A. I haven't the least idea because I don't know. I had never measured it that far. I don't have any idea how far it is because I can't say how far it is, Mr. Ferguson. I have never measured how far is it from 6th and Nun to Oleander Drive. Like I don't know because I can't say how far it is.

Q. Is it 2 or 3 miles out, Allen Hall?

SOLICITOR STROUD: OBJECTION.

THE COURT: SUSTAINED.

He said he did not know how far is it.

Q. You don't know how long it took you or how long you stayed or how long it took you to get back?

A. I didn't have a watch. Even if I did have a watch at that time I probably wouldn't have been timing the time we left the church, the time we got to Oleander Drive, the time we got to Fields and then the time we stopped at the service station. Chavis had a watch to my knowledge. I don't know whether he timed the time we left or not. He could have, but I don't know. I don't know what time it was when I arrived back at Rev. Templeton's house right offhand. I went back to Rev. Templeton's when I left Oleander Drive when I left the service station.

Q. Did you go anywhere other than Fields and the service station where you got the gasoline?

A. Firemomb Mike's Grocery and to shoot at the whites on 5th and Nun. That is where I went when I got back. I don't know what time it was when I went to firebomb Mike's Grocery. I don't know what time it was when I got back. I don't know what time it was when I went to shoot the man on 5th and Nun. I don't know what time it was when I got back.

State v. Chavis

Q. What time did you go to bomb the man?

A. I told you I do not know. I don't know what time it was whenever we left. I don't know what time it was when we got back. I didn't ask anybody what time it was. Time was not on my mind. Time was not concerned. Maybe Ben Chavis would worry about time because he had a deadline. I don't know.

Q. You don't have any idea what time it was whenever you did any of these things?

Solicitor Stroud: Object.

A. I don't know what time it was. I have told you and told you.

Q. I want you to tell me what time it was—

(The witness came off the witness stand and attempted to reach the defense table. Chairs and tables were pushed around and upset. The witness was subdued. All the jurors had left the courtroom with the exception of juror 8. The jurors returned to the jury box and were asked to retire to the jury room by the Court.)

The Court: We'll take about a 10 minute recess."

During the recess, and in the absence of the jury, the trial judge issued the following admonition:

"The Court: Gentlemen, I have asked you to keep your voice lowered and when it is apparent that this witness is becoming excited your voice got louder and you stood up and kept asking him questions until it was very apparent that he was becoming excited. I am asking you to keep your voice lowered and not excite the witness, and continue with this trial."

Near the beginning of the above quoted cross-examination, it is clear that defense counsel was using an unusually loud tone in his cross-examination. The Solicitor objected on the ground that "He doesn't have to shout." Before the occurrence of the above quoted cross-examination, it was evident that the tone in which defense counsel had examined the witness was unusually loud. The record discloses the following:

"Q. But you didn't feel it necessary to make any additions or corrections before you went on the witness stand. Is that correct?

---

State v. Chavis

---

A. (To Court) Do you mind telling Mr. Ferguson he don't have to be hollering at me like a dog. I can understand it.

THE COURT: Just a minute. Members of the jury, will you retire to your room, please?

(The jury retired to the jury room.)

THE COURT: I think if we can lower this microphone. You are talking too close to it, it may sound pretty loud, and the speaker is right above his head.

MR. FERGUSON: Your Honor, I move this witness be held in contempt for the language he used on the stand with reference to me.

THE COURT: You will not make any statements of that kind again. And we'll all take a few minutes recess now."

It is evident from the trial judge's several admonitions that defense counsel continued with unusually loud questioning right up to the time the witness left the witness stand and attempted to reach the defense table. Thereafter, in spite of the confusion created by this tone in cross-examination, defense counsel persisted in using the loud tone to the extent that it was necessary for the trial judge to admonish defense counsel on at least two later occasions as follows:

"Q. Didn't you tell Mr. Stroud what time it was?

THE COURT: Gentlemen, I'll ask you to keep your voices down now.

Q. Didn't you tell Mr. Stroud what time it was?

THE COURT: Just a minute. All right. Proceed."

*    *    *

"Q. Is there anything in the signed statement about going to the Community Center and breaking in?

SOL. STROUD: Your Honor, OBJECTION to his tone of voice.

MR. FERGUSON: Your Honor, how is he going to object to the tone of my voice?

THE COURT: Obviously it's loud. Just keep your voice down. Go ahead, answer the question."

Defendants made two motions, one for a mental examination of the witness Allen Hall, and another for a mistrial because of the reaction of the witness Allen Hall to defense counsel's cross-examination. On Tuesday, 3 October 1972, the trial judge ruled upon the motions, in the absence of the jury, as follows:

"COURT: On the motion of Mr. Ferguson as of late yesterday afternoon when he moved that the witness Hall be required to have a mental examination and that his evidence be stricken from the record and for mistrial, the Court finds as a fact that:

The witness Hall at the time of the incident in which he came off the witness stand was under cross examination by Mr. Ferguson and that he had been on the stand approximately five days; under cross examination since Thursday about 2 o'clock.

That the Court further finds that the witness Hall had reacted similarly in the preliminary hearing and that during the cross examination he had requested the Court to instruct Mr. Ferguson not to examine him in the manner in which he was doing and that the Court had requested Mr. Ferguson to lower his voice on several occasions and that also the Court requested Mr. Ferguson to allow the witness opportunity to answer questions before another one was interposed; that at the time of the incident while the witness was answering a question another question was interposed by Mr. Ferguson and that Mr. Ferguson stood up about the time that the witness was visibly disturbed, at which time, as the Court observed, the witness came off the stand and had to be restrained by officers.

The Court finds and concludes that the demeanor of the witness and the incident was precipitated in some degree by his long cross examination, the rapidity of the questions, the tone of voice of the examiner and that the motion for a mental examination of the witness is not required and the motion is denied.

MR. FERGUSON: May we let the record show that we except to each and every finding of fact by the Court and to the conclusions of law.

COURT: And also that the motion to strike the evidence of the witness is denied.

MR. FERGUSON: I would like if I may, to state that we would like to call to the Court's attention that shortly after the cross examination of the witness had begun and during recess of the Court we called to the Court's attention the fact that the witness was mouthing obscenities to me from the witness stand.

COURT: And also I believe that I made the remark, I asked you was it audible and you said there was no audible sound.

MR. FERGUSON: That is correct.

COURT: The motion for mistrial is denied."

Prior to the occasion which precipitated the above two motions, the trial judge requested and admonished defense counsel to lower his voice in his cross-examination of the witness Allen Hall. Counsel ignored the request and admonition. As pointed out above, after the occasion which precipitated the two motions, defense counsel persisted in the same type of unusually loud cross-examination, and it was necessary for the trial judge to further admonish defense counsel.

We have given careful consideration to defendants' argument that the denial of their motions constituted error entitling them to a new trial. In our opinion the trial judge exercised his sound judicial discretion in denying the motions. No legal error or abuse of discretion has been shown. This assignment of error is overruled.

[16]  Defendants next argue their assignment of error number XVI. The focal point of this argument is that the trial judge committed prejudicial error in refusing to allow defense counsel to bring out, during trial, the place where the State's witnesses Allen Hall and Jerome Mitchell were being housed during the trial. The trial judge permitted the witnesses to make their answers to the court reporter only, and directed that the information not be divulged until after the trial. It is obvious that the trial judge was trying to protect the State's legitimate interest in keeping the housing facilities of the State's witnesses inaccessible to defendants and their supporters. The answer given the court reporter by the witness Allen Hall amplifies this thought.

State v. Chavis

"Q. Are you presently being kept in a Prison Unit?

SOL. STROUD: OBJECTION.

THE COURT: SUSTAINED.

MR. FERGUSON: I'd like to have his answer in the record.

THE COURT: Step down and whisper to the Court Reporter.

A. (Whispered) I have been kept with deputies and policemens [sic] and so Mr. Ferguson won't try to contact and make any threats whatsoever."

The only questioning of the State's witness Allen Hall concerning special treatment was as follows:

"Q. What special treatment have you received since you have agreed to be a witness in this case?

A. I haven't agreed to be a witness for the State, as you put it. All I just told like I haven't agreed on nothing. All I just said was that I will tell the truth what happened. I haven't agreed to anything.

"Q. My question is, 'What special treatment have you received?'

A. None whatsoever. I don't consider being taken to my mother's house special treatment.

Q. Would you consider staying somewhere other than a prison facility such as a hotel to be special treatment?

SOL. JOHNSON: OBJECTION.

THE COURT: SUSTAINED.

"Q. I don't care to ask this witness anything else."

The only questioning of the State's witness Jerome Mitchell concerning special treatment was as follows:

"Q. You and Allen Hall are staying together during this trial, are you now?

SOL. STROUD: OBJECTION.

THE COURT: SUSTAINED.

Q. I'll ask you if you and Allen Hall aren't sharing a room at the Blockade Runner on Wrightsville Beach?

SOL. STROUD: OBJECTION.

THE COURT: SUSTAINED.

A. (Whispered) No.

Q. Are you presently staying in any prison facility?

SOL. STROUD: OBJECTION.

THE COURT: SUSTAINED.

MR. FERGUSON: Like to have it put in the record.

THE COURT: Step down.

A. (Whispered) No.

Q. I'd like for you to tell the Court Reporter where you are staying anywhere other than the Blockade Runner Motel.

SOL. STROUD: OBJECTION.

THE COURT: SUSTAINED.

MR. FERGUSON: I'd like to have it in the record.

SOL. STROUD: May it be directed that she not divulge this record?

THE COURT: Put it in the record and I will rule on it.

SOL. STROUD: We OBJECT to this.

A. (Whispered) Carolina Beach.

THE COURT: The motion of the State is allowed that you not divulge this information as to where he is staying now to anyone until after this trial is over.

THE COURT: Proceed.

MR. FERGUSON: I have no further questions.

MR. HUNOVAL: Your Honor, I don't have any questions of this witness."

It is obvious from the foregoing cross-examination that the only information defense counsel was denied was the location of housing facilities provided for the two State's witnesses during

trial. The excluded answers clearly did not disclose bias, interest, or a promise or hope of reward on the part of the witness. In fact, counsel's questions were not appropriately directed towards a disclosure of bias, interest, or a promise or hope of reward. The areas of inquiry permitted by *Alford v. U. S.*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931), and *State v. Carey*, 285 N.C. 497, 206 S.E. 2d 213, are not presented by this assignment of error. We hold that the trial judge did not commit error prejudicial to defendants in excluding the witnesses' answers. This assigment of error is overruled.

Defendants next argue their assignment of error number XV. The grouping of exceptions under this assignment of error does extraordinary violence to the rules of appellate practice in North Carolina. Under this assignment of error defendants group 2,685 exceptions covering a wide variety of questions of law and legal procedure. The fact that defendants assert that each of the 2,685 rulings of the trial judge denied their Sixth Amendment and due process and equal protection rights under the United States Constitution does not make them a single question of law or legal procedure.

[17, 18] Many decisions of the North Carolina Supreme Court and of this Court have pointed out that our rules relating to grouping of exceptions require that all exceptions relating to the same question of law be grouped under one assignment of error and that only those exceptions relating to the same question of law be grouped under a single assignment of error. *E.g., State v. Blackwell*, 276 N.C. 714, 174 S.E. 2d 534; *State v. Wilson*, 263 N.C. 533, 139 S.E. 2d 736; *Conrad v. Conrad*, 252 N.C. 412, 113 S.E. 2d 912; *State v. Atkins*, 242 N.C. 294, 87 S.E. 2d 507; *Dobias v. White*, 240 N.C. 680, 83 S.E. 2d 785; *State v. Clark*, 22 N.C. App. 81, 206 S.E. 2d 252; *State v. Dickens*, 11 N.C. App. 392, 181 S.E. 2d 257; *Nye v. Development Co.*, 10 N.C. App. 676, 179 S.E. 2d 795; *State v. Patton*, 5 N.C. App. 501, 168 S.E. 2d 500; *State v. Conyers*, 2 N.C. App. 637, 163 S.E. 2d 657. An assignment of error which attempts to present several different questions of law is broadside and ineffective. *State v. Kirby*, 276 N.C. 123, 171 S.E. 2d 416. This assignment of error states that defendants' several constitutional rights were violated "by admitting into evidence over defendants' objections testimony of witnesses for the State which was irrelevant, immaterial, incompetent, remote, prejudicial and inflammatory." It thereafter lists by number 2,685 exceptions. It

seems clear to us at a glance that such an assignment of error is broadside and ineffective.

We have read all of the testimony presented to us by the record on appeal. In reading the testimony, we have observed and considered the 2,685 rulings of the trial judge upon the admission of the State's evidence to which defendants take exception. In our opinion some of the rulings constituted error. However, we found no error, either singly or in combination, in the admission of State's evidence which, had the evidence been excluded, presents a reasonable likelihood that the results of the trial would have been different. That portion of the State's evidence which was clearly competent was overwhelmingly sufficient to support the verdicts of guilty. In our opinion the errors in the admission of State's evidence were non-prejudicial beyond a reasonable doubt. This assignment of error is overruled.

[19] Defendants next argue their assignment of error number XXV. By this assignment of error they contend that the trial judge erred in permitting the State to offer testimony of witnesses whose names had not been furnished to defendants.

There is no statute in this State which requires the State to furnish a defendant in a criminal case with a list of the prospective State's witnesses. Defendants concede that, absent a statute, an order to furnish such a list is in the discretion of the trial court. *State v. Hoffman,* 281 N.C. 727, 190 S.E. 2d 842. Defendants filed a motion to compel the State to furnish them a list of prospective witnesses for the State. The Solicitor voluntarily furnished defendants a list of the witnesses he proposed to call at that time, and no order from the court was thereafter requested or entered. The defendants were not legally prejudiced merely because the State later offered additional witnesses, not found on the list supplied by the Solicitor to defendants, who testified to elements of the charges against them. "Prejudicial surprise results from events 'not reasonably to be anticipated or perhaps testimony contrary to a prior understanding between the parties or something resulting from fraud or deception.' " *State v. Hoffman, supra* at 735. The record before us fails to disclose such prejudicial surprise.

Permitting these witnesses to testify over objection by defendants was a matter in the discretion of the trial judge, not reviewable on appeal in the absence of a showing of abuse

State v. Chavis

of discretion. *State v. Hoffman, supra.* No abuse of discretion appears. This assignment of error is overruled.

[20]    Defendants next argue their assignment of error number XXII. By this assignment of error they contend that the trial judge committed reversible error in permitting a rebuttal witness for the State to give testimony adverse to the nine defendants who had not offered evidence. The defendant Ann Shephard was the only one of the ten defendants who testified and offered evidence in her own behalf. After defendant Shephard rested her defense, the State offered the witness Eric Junious in rebuttal, and he was permitted to testify over the objection of the other nine defendants.

In her defense to the charge of being an accessory before the fact of the felonious burning of Mike's Grocery on Saturday, 6 February 1971, by the other nine defendants, the defendant Shephard testified that she was not present at Gregory Congregational Church on the Saturday night. She also testified that she heard no plans to burn Mike's Grocery and said nothing to encourage the group to burn Mike's Grocery. Her witness testified that he was in the church on the Saturday night but that defendant Ann Shephard was not there, nor were any of the other nine defendants there, except the defendant Tindall. In rebuttal the State offered one witness who testified that he was in Gregory Congregational Church on Saturday night, 6 February 1971, and that defendant Ann Shephard was there, as were the other nine defendants. He further testified that defendant Chavis talked to the group in the church about the "Chicago Strategy" and the burning of Mike's Grocery. He also testified the defendant Shephard addressed the group and told them she thought what they were doing was right.

Obviously this testimony was in rebuttal of defendant Shephard's evidence. It is equally obvious that the State's evidence against defendant Shephard, either in chief or in rebuttal upon a charge of being an accessory before the fact to felonious burning, would necessarily involve the other nine defendants who are charged with the actual burning. The ten defendants were tried together without objection. They are in no position tion to complain now. In any event, it was within the discretion of the trial court to permit the State to reopen its case against defendants. 2 Strong, N.C. Index 2d, Criminal Law, § 97. This assignment of error is overruled.

[21]   Defendants next argue their assignment of error number XXIII. By this assignment of error they contend that the trial judge committed error prejudicial to the defendants by failing to order a mistrial when a juror stated that he knew the State's witness. The sixteenth witness called by the State was Officer Chipps of the Wilmington Police Department. As he was called to the stand by the Solicitor, the following transpired:

"THE COURT: Call your next witness.

SOLICITOR STROUD: State will call Officer Chipps, your Honor.

JUROR NUMBER 1: I think I should make you aware of the fact that I know him.

THE COURT: All right, sir."

After the witness identified himself and his position with the police department, defendants entered general objections and motions to strike to almost everything the witness said. This is the same procedure followed by defendants with respect to every other witness for the State.

Defendants argue that the trial judge erred in denying their motion for mistrial at the time the juror made it known to the court that he knew the witness Chipps. The record does not disclose a motion for mistrial by defendants or any ruling on such a motion by the trial judge. The record does not disclose any effort by defendants to further examine the juror or to have the trial judge further examine the juror, touching upon the effect, if any, of the juror's acquaintance with the witness. Apparently the defendants were satisfied that the juror would be impartial in spite of the acquaintance. They cannot raise this question for the first time on appeal.

The juror had been closely examined by the trial judge, by the State, and by the defendants before he was accepted to serve. This statement by the juror was just further indication of his intention to be fair and candid with the State and the defendants. It might well be that the juror's acquaintance with Officer Chipps would tend to cause the juror to give little or no credit to the witness' testimony. This assignment of error is without merit and is overruled.

[22]   Defendants next argue their assignment of error number VIII. By this assignment of error they contend that the trial resulting in their conviction subjected them to double jeopardy.

These cases were first called for trial in Pender County before Judge James presiding at the 5 June 1972 Session. After several days of jury selection, during which only three jurors were accepted and seated, the Assistant District Attorney (Solicitor) assigned to prosecute the cases became ill and was hospitalized. Upon motion of the State, Judge James, in his discretion, ordered that the trial of the cases be continued to a subsequent session. At the time the continuance was ordered, a jury had not been sworn and empaneled to try the cases. It is clearly established in this State that jeopardy cannot attach until a jury has been sworn and empaneled. "Jeopardy attaches when a defendant in a criminal prosecution is placed on trial: (1) on a valid indictment or information, (2) before a court of competent jurisdiction, (3) after arraignment, (4) after plea, and (5) when a competent jury has been empaneled and sworn." *State v. Cutshall,* 278 N.C. 334, 344, 180 S.E. 2d 745. Defendants concede that all the elements necessary for jeopardy to attach are not present in this case. Although it does not bear upon the disposition of this assignment of error, we view the use by Judge James of the phrase that a mistrial was ordered to be surplusage because his order continuing the trial to a subsequent session was all that was required. This assignment of error is overruled.

[23]   Defendants next argue their assignment of error number XXIX. By this assignment of error defendants contend that it was error to deny their motion to suppress the evidence obtained by search of the Gregory Congregational Church and parsonage. At the conclusion of a *voir dire* hearing on the legality of the search and the standing of the defendants to object, the trial judge, from competent evidence, found facts and ordered as follows:

"COURT: The Court finds as a fact that W. H. Butler, Chairman of the Board of Trustees of the Gregory Congregational Church, went to the church on February 6, 1971, and saw numerous persons milling around the church and several in the church; that he met the defendant Chavis in the church and told the defendant Chavis that what they were doing was wrong and asked them to leave.

"The Court further finds as a fact that none of the defendants were members of the Gregory Congregational Church on February 6, 1971, or at any subsequent time.

"The Court further finds as a fact that the church officials had—that Mr. Butler nor any of the church officials had given any authority to the defendants to hold any meeting that week.

"The Court further finds as a fact that Mr. Butler returned to the area of the church on Sunday, February 7, and that persons were still about the church.

"The Court further finds as a fact that Capt. Corbett, along with other officers and a detachment of the National Guard went to the Gregory Congregational Church on Monday, February 8, 1971, and upon arriving at the front door of the church, Mr. Bryant, H. C. Bryant, a member of the Gregory Congregational Church, approached Capt. Corbett and told him that there was no need for a search warrant and then unlocked the doors to the church and accompanied the police officers and National Guard officers as they searched the church; that Mr. Bryant had known Capt. Corbett for several years.

"The Court further finds as a fact that Mr. Butler, Chairman of the Board of Trustees, opened the parsonage and allowed the officers to search the parsonage.

"The Court further finds that no one was at the church or the parsonage when the same was entered by the officers.

"The Court further finds as a fact that Rev. Templeton, the possessor of the parsonage, was not there and that he is not a defendant in the trial of these cases.

"The Court further finds as a fact that no member of the Gregory Congregational Church is a defendant in these cases.

"The Court finds and concludes that the evidence obtained from the search of the church and the parsonage on Febuary 8th is lawful and competent evidence in these cases. The motion to suppress is denied."

It appears from the uncontradicted evidence that defendants had been trespassers on the church premises. In our view they

have absolutely no standing to object to the search. *State v. Eppley,* 282 N.C. 249, 192 S.E. 2d 441. In addition the search was conducted with the permission of one of the officials of Gregory Congregational Church, who had several days earlier tried, without success, to evict defendants from the church premises. This assignment of error is overruled.

[24] In addition to the assignments of error heretofore discussed, the defendant Ann Shephard argues assignments of error numbers XXXII and XXXIII. By these assignments of error she contends that her motions for nonsuit, made at the close of the State's evidence and at the close of all the evidence, should have been allowed. It is her contention that the conduct and statement attributed to her are not sufficient to support a verdict of guilty of the charge of accessory before the fact of the felonious burning of Mike's Grocery. The question is whether her voluntary presence in the Gregory Congregational Church with the other defendants for several days, particularly on Saturday, 6 February 1971, during the explanation of the "Chicago Strategy" and the planning of the burning of Mike's Grocery Store, and her statement to the group as they were distributing weapons in preparation for the burning and ambush are sufficient evidence to be submitted to the jury. According to the State's evidence, she stated: "I think it is right what you all are doing. Y'all should show them you mean business."

Defendant Shephard was charged with being an accessory before the fact in a bill of indictment which reads in part as follows:

"That Ann Shephard late of the County of New Hanover on the 6th day of February 1971 with force and arms, at and in the County aforesaid, did unlawfully, wilfu'ly and feloniously become an accessory before the fact of the unlawful, wilful, malicious and felonious damaging and burning of Mike's Grocery Store building, located at 6th & Ann Street in Wilmington and owned and occupied by Mike Poulos, by the use of incendiary devices, i.e., fire-bombs, by Benjamin Chavis, Marvin Patrick, Connie Tindall, Jerry Jacobs, James McKoy, Willie Earl Vereen, Allen Hall, Reginald Epps, Joe Wright and Wayne Moore by counseling, inciting, inducing and encouraging said parties to commit said felony . . . . "

Our Supreme Court, in *State v. Bass*, 255 N.C. 42, 120 S.E. 2d 580, has defined the offense as follows:

" 'There are several elements that must concur in order to justify the conviction of one as an accessory before the fact: (1) That he advised and agreed, or urged the parties or in some way aided them to commit the offense. (2) That he was not present when the offense was committed. (3) That the principal committed the crime.' (Citation omitted.)

" 'The concept of accessory before the fact has been held to presuppose some arrangement with respect to the commission of the crime in question.' (Citation omitted.)

" 'To render one guilty as an accessory before the fact to a felony he must counsel, incite, induce, procure or encourage the commission of the crime, so as to, in some way, participate therein by word or act. . . . It is not necessary that he shall be the originator of the design to commit the crime; it is sufficient if, with knowledge that another intends to commit a crime, he encourages and incites him to carry out his design. . . . ' (Citation omitted.)" 255 N.C. at 51, 52.

The law in North Carolina is in accord with the generally accepted definition of this offense. *See* 22 C.J.S. *Criminal Law* § 90; 21 Am. Jur. 2d *Criminal Law* § 124.

The State's evidence tended to show that plans had been made to burn Mike's Grocery; that defendant Shephard was present in Gregory Congregational Church for several days and nights; that Gregory Congregational Church was used by defendant Chavis as a headquarters to distribute weapons and organize the commission of several offenses; that defendant Shephard was present when defendant Chavis explained the "Chicago Strategy" and explained plans to burn Mike's Grocery; that defendant Shephard, although not participating in the actual burning, encouraged the other nine defendants (and others) to commit the felony of burning Mike's Grocery; and that Mike's Grocery was feloniously burned. This evidence reflected all the elements of the offense with which defendant Shephard was charged, and it fully supports the verdict of guilty. There was no error in the denial of her motions for nonsuit.

Defendant Shephard also brings forward assignment of error number XXX in addition to those argued by the other

State v. Chavis

nine defendants. This assignment of error is as follows: "The trial court erred by permitting the State to ask improper questions upon cross examination of defense witnesses and of the defendant Shephard herself, thereby eliciting testimony which was incompetent, irrelevant, immaterial, remote, inflamatory and prejudicial to the defendants. Exception Nos. 3483-3653 (Rpp. 2041-2089)."

At a glance it is clear that defendant Shephard has attempted to group 171 exceptions, upon varying questions of law and legal procedure, scattered throughout 49 pages of the record on appeal. She did not undertake to tell us which page of the record a particular exception appears. As pointed out earlier, this type of assignment of error is broadside and ineffective. Defendant's motion to file an addendum to the record on appeal to amend her assignments of error was allowed by this Court. However, her amendment does not bring her assignment of error into compliance with the North Carolina rules.

In reading the testimony, we observed and considered the rulings of the trial judge to which defendant Shephard excepts. In our opinion such errors as the judge may have committed in those rulings were harmless beyond a reasonable doubt.

The other two assignments of error brought forward in defendant Shephard's brief (numbers XV and XX) have heretofore been discussed with respect to all defendants.

We have given written recognition to each grouping of exceptions and assignment of error brought forward and argued in the briefs. "Exceptions in the record not set out in appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned by him." Rule 28, Rules of Practice in the Court of Appeals.

In our view defendants had a fair trial before an impartial, patient, and courteous judge and by a competent, unbiased jury. They have been accorded every reasonable request. The State's evidence was clear, and overwhelmingly tended to show the guilt of each defendant of the offenses with which he was charged. In the trial we find no prejudicial error.

No error.

Judges CAMPBELL and VAUGHN concur.