STATE OF NORTH CAROLINA v. ROBERT LOUIS HARDY AND WILBUR WILLIAM FOLSTON, JR.

No. 23

(Filed 14 July 1977)

1. **Criminal Law § 31— judicial notice—percentage of women in county**

   The percentage of women in a given county is not properly the subject of judicial notice.

2. **Constitutional Law § 61— grand jury—systematic exclusion of women —failure of proof**

   Even if the male defendants have a right to complain of underrepresentation of women on the grand jury which indicted them, defendants failed to make out a *prima facie* case of discrimination against women where they presented evidence of the percentage of female grand jurors in the county during a four-year period but presented no evidence of the percentage of women in the county.

State v. Hardy

3. **Constitutional Law § 61— grand jury—systematic exclusion of 18 to 21 year olds—failure of proof**

Even if the 18 to 21 year age group is considered a constitutionally identifiable group, defendants failed to make out a *prima facie* case of systematic exclusion of 18 to 21 year old persons from the grand jury which indicted them where they failed to present evidence of the proportion of 18 to 21 year olds serving on the grand juries in the county or of their percentage in the population of the county.

4. **Constitutional Law § 60— grand jury—systematic exclusion of blacks —failure of proof**

The systematic exclusion of blacks from the grand jury will not be presumed where no evidence of racial discrimination was presented and defense counsel made no effort to produce such proof, notwithstanding defendants contend that failure of the county to keep records of the race of members of the jury list or of persons selected to serve on juries made it impossible for them to meet their burden of proof.

5. **Constitutional Law § 61— grand jury—absence of systematic exclusion —findings**

The court's finding that there was no evidence before it to indicate systematic exclusion of blacks, women and 18 through 21 year olds from the grand or petit juries was supported by the record; furthermore, the court was not required to make findings of fact where the evidence was not contradictory or conflicting.

6. **Constitutional Law § 61— grand and petit juries—absence of systematic exclusion**

The State's evidence showed that there was no systematic exclusion of any cognizable group from the grand or petit juries where it showed that the jury commissions used names from the voter registration records and tax lists in preparing the jury lists, that they used a neutral systematic selection procedure (e.g., every sixth name) in selecting names from the source lists as required by G.S. 9-2, and that the only criteria used in striking names from the jury list were the permissible disqualifications set out in G.S. 9-3.

7. **Criminal Law § 92.1— consolidation of charges against two defendants —same offense**

The State's motion for consolidation of charges for the same crimes against two defendants was addressed to the sound discretion of the trial judge, and the judge's exercise of that discretion will not be disturbed absent a showing that a defendant has been denied a fair trial by the order of consolidation.

8. **Constitutional Law § 72; Criminal Law § 48— statements by codefendant—admission by silence**

In this joint trial of two defendants for a felony-murder in which neither defendant took the stand and testified, defendants' rights of confrontation, as stated in *Bruton v. United States*, 391 U.S. 123, were not denied by the admission of testimony by a cellmate

of defendants that he heard one defendant ask the second defendant why he shot the man and the second defendant did not reply, and that the second defendant stated in the first defendant's presence that the first defendant told him you had to kill the victim or he would testify, since the statement of each defendant was admissible against the codefendant as an implied admission by silence, and the *Bruton* rule does not apply where the admissions of a nontestifying codefendant are admissible against the defendant under well-recognized rules of evidence.

9. **Criminal Law § 117.3— grant of immunity—instruction to jury—when given**

The trial court was not required by G.S. 15A-1052 to instruct the jury immediately before a witness's testimony that the witness was testifying under a grant of immunity, and the court's instruction prior to the presentation of any evidence that the witness would testify under a grant of immunity if he testified was sufficient to comply with the requirement of the statute that the instruction be given "prior" to the testimony; furthermore, the court's instruction which failed to give all of the terms of the grant of immunity did not violate the statute where the material terms of the grant of immunity were explained, since the statute does not require the judge to inform the jury of the details of the grant, and the court's instruction substantially complied with the statute.

10. **Criminal Law § 117.3— grant of immunity—interested witness—time of instruction to jury**

The requirement of G.S. 15A-1052(c) that the trial judge "during the charge to the jury" must instruct that a witness testifying under a grant of immunity is an interested witness whose testimony must be carefully scrutinized means during the *final* charge and not in advance of the witness's testimony.

11. **Criminal Law § 117.4— all evidence shows witness as accomplice—instruction**

Where all the evidence showed that a State's witness was an accomplice, the court should have instructed the jury that the witness's testimony should be carefully scrutinized without first requiring a finding by the jury that the witness was an accomplice; however, the court's instruction requiring the jury first to find that the witness was an accomplice was invited by defendant's tendered instruction and did not constitute prejudicial error.

12. **Bills of Discovery § 6— prior recorded statements—pretrial discovery —statutory authority**

The court had no authority under G.S. 15A-903(d) to order pretrial discovery by defendant of a prosecution witness's prior recorded statements, although such statements were material to the preparation of the defense, since the court's authority under G.S. 15A-903(d) is limited by provisions of G.S. 15A-904(a) restricting discovery of statements made by prospective witnesses to anyone acting on behalf of the State.

**13. Constitutional Law § 30; Bills of Discovery § 6— pretrial discovery— statutory restriction—inherent authority**

Where a statute restricts pretrial discovery, the trial court has no inherent authority to order pretrial discovery of items so restricted.

**14. Bills of Discovery § 6— pretrial discovery order—effect**

A judge's pretrial order of discovery of "other papers, documents, photographs, mechanical or electronic recordings, tangible objects in control of the State relative to said case" applied only to those materials defendants are permitted to receive under G.S. 15A-903(d), as limited by G.S. 15A-904(a).

**15. Criminal Law § 82.1— attorney and client—work product privilege**

The work product doctrine is a qualified privilege for certain materials prepared by an attorney acting on behalf of his client in anticipation of litigation; it applies in civil as well as criminal cases and has been extended to protect materials prepared for the attorney by his agents as well as those prepared by the attorney himself.

**16. Criminal Law § 82.1— waiver of work product privilege**

The work product privilege is waived when the defendant or the State seeks at trial to make a testimonial use of the work product; therefore, when the State elected to use as a witness a person who had given a tape recorded statement to the police, it waived its right to claim the recorded statement was privileged with respect to matters covered in the witness's testimony.

**17. Constitutional Law § 30; Bills of Discovery § 6— disclosure of State's evidence**

The prosecution is constitutionally required to disclose only *at trial* evidence that is favorable and material to the defense.

**18. Constitutional Law § 30; Bills of Discovery § 6— motion for discovery at trial—in camera examination**

When a specific request is made *at trial* for the disclosure of evidence in the State's possession that is obviously relevant, competent and not privileged, the trial court is required, at a minimum, to order an *in camera* examination of the evidence and to make appropriate findings of fact; if the court rules against the defendant on his motion for discovery, the judge should order the sealed evidence placed in the record for appellate review.

**19. Constitutional Law § 30; Bills of Discovery § 6— failure of State to provide recorded statement—pretrial discovery order—motion to strike—motion for mistrial**

The trial court did not err in failing to strike . a witness's testimony or to declare a mistrial because the State failed to provide the witness's tape recorded statement pursuant to a pretrial discovery order where the State was not required to divulge the statement prior to trial, defendants made no request for disclosure of the statement at trial, and defendants failed to ask for a sealed transcript of the statement to be placed in the record for appellate review.

State v. Hardy

**20. Homicide § 21.6— felony-murder—sufficiency of evidence**

The State's evidence was sufficient to be submitted to the jury on the issue of defendant's guilt of felony-murder where it tended to show that defendant borrowed his sister's car in Asheville so that he and his two companions could go to Durham; defendant remained in the car while his two companions entered a service station near Morganton and robbed and shot to death the station attendant; defendant was the only adult and oldest member of the group; defendant was a leader among black students at the college he attended; the car defendant borrowed from his sister had a phony license plate a short time after the robbery, and the lawful license plate was found under the front seat; before leaving Asheville, defendant placed a shotgun in his sister's car; at the service station, defendant ordered a bystander into the car and threatened him with the same fate as the murdered station attendant; in the car, defendant stated that the incident at the service station had occurred because the black man was "sick and tired of being opposed or stepped on"; defendant told one companion that when a police officer approached the car and asked for his driver's license, "he would have to shoot him"; defendant drove away from the police after the car was stopped; a shotgun and several pistols were found in the car after it wrecked while the police chased it; defendant ran from the police after the wreck; and while in jail, defendant told his codefendant that he had to kill the victim or he would talk.

**21. Homicide § 31.1— first degree murder—substitution of life sentences for death penalties**

Sentences of life imprisonment are substituted for penalties of death imposed for first degree murder.

**22. Constitutional Law § 40— indigent defendant—appointment of only one attorney**

Only one competent attorney should have been appointed to represent each indigent defendant in the trial and appeal of this case.

Justice LAKE concurs in result.

DEFENDANTS appeal from judgments of *Friday, J.*, 7 June 1976, Special Criminal Session, CLEVELAND County Superior Court.

On indictments, proper in form, defendants were charged with kidnapping, armed robbery, murder, and conspiracy to commit armed robbery and murder. A third defendant, Kevin Michael Green, was indicted for kidnapping, armed robbery and murder. The bills of indictment were returned in Burke County Superior Court. Upon motion for a change of venue, the cases were transferred to Cleveland County Superior Court for trial.

Upon call of the cases for trial, the district attorney announced that he intended to proceed only under the felony-murder rule against the two defendants and moved to consolidate the cases for trial. This motion was allowed and defendants' motions for a severance were denied.

At arraignment, defendant Folston pleaded not guilty. Defendant Hardy, upon being arraigned, tendered a plea of guilty to accessory after the fact of murder and robbery to the State, but this plea was not accepted by the State. Defendant Hardy refused to plead further so the court entered a plea of not guilty for him.

The trial commenced on 7 June 1976. The jury was selected after four full days of *voir dire* examination. Defendants were found guilty of first-degree murder and sentenced to death.

The State's evidence tended to show the following:

Hardy, aged 24, Folston, aged 19, and Green, aged 17, were at a lounge in Asheville, North Carolina, on the evening of 30 July 1975, and decided to go to Durham, North Carolina. They borrowed Hardy's sister's car, a 1971 Chevelle for the trip. Hardy transferred a shotgun from his car to his sister's car. During the early morning hours of 31 July 1975, the three left Asheville and proceeded east on Interstate 40. Hardy operated the vehicle. Folston rode on the passenger side of the front seat and Green rode in the rear. Before leaving Asheville, defendants each took a purple pill to stay awake which had the effect of increasing their laughter and talking.

At about 4:30 a.m., they arrived in the vicinity of Morganton, Burke County, North Carolina. They left Interstate 40 and pulled into a nearby Shell Service Station where Darrell Monroe Baldridge, the deceased, was working as a service station attendant and Vernon Robert Fragiacomo, a hitchhiker, was waiting for a ride to Richmond, Virginia.

Green and Folston went inside the station to use the restroom and to buy drinks from the drink machine. Hardy stayed at the automobile and purchased $2.00 worth of gasoline. He conversed with the deceased, Baldridge, and also with the hitchhiker, Fragiacomo. Folston returned and asked the attendant for change for a dollar. Green and Folston followed Baldridge into the service station. Inside Baldridge was forced

to open the cash register. At gunpoint Folston and Green took cash from the register and a .38 caliber pistol belonging to the station owner. According to Green's testimony, he then left the building and on his way to the car, heard a shot fired which resulted in the death of the service station attendant, Baldridge. Fragiacomo testified that Folston and Green were both inside the station at the time the fatal shot was fired. Through the window, Fragiacomo was able to observe Baldridge lying spread-eagle on the floor and saw the expression leave his face when the shooting occurred.

Baldridge lived unconscious for six days. The cause of death was a gunshot wound to the head. A .22 caliber bullet was removed from his brain, but the bullet was so mutilated it could not be identified as having come from a .22 caliber pistol that was later recovered.

After the shooting, Hardy threatened Fragiacomo with the same fate and ordered him to get into the car. When Folston and Green returned to the car, defendant Hardy drove east on Interstate 40 in the general direction of Durham, North Carolina, until coming to a detour near Hickory. A sheriff's car was parked along the road so Hardy asked the officer where Interstate 40 continued. They had traveled a short distance when they were pulled over into a shopping center parking lot by officers of the Hickory Police Department.

One patrolman approached the driver's side and asked Hardy for his driver's license and registration. The officers observed a shotgun in the hands of Green who was sitting in the rear seat and pulled their pistols. Defendants Hardy and Folston were directed to lay their hands on the dashboard. At this point, defendant Hardy shifted the car into gear and drove off.

A high speed chase ensued during which gunshots were fired from the vehicle being pursued. The Chevelle traveled west on Highway 64-70. Eventually, Hardy lost control of the vehicle in Pottery or Deadman's Curve and wrecked it. Folston and Green were taken into custody at the scene of the wreck. Defendant Hardy was apprehended in a field about four-tenths of a mile from the site of the accident two hours later.

Fragiacomo was treated at a hospital. After his release, he continued to receive medical and psychiatric attention for some time.

The cash register tape at the service station showed sales, including cash and credit, of some $1,400.00 for the day of the robbery. $248.00 and some change were recovered from under the right front floor mat of the Chevelle. At the scene of the wreck, two guns were found outside the car, and one gun and a shotgun were recovered from inside the automobile, including a .22 caliber pistol and the .38 caliber pistol stolen from the service station. At some earlier time, the lawful license plate for the Chevelle had been removed and another license plate substituted therefor. The lawful plate was found under the right-hand side of the front seat.

Cross-examination of co-defendant Green revealed that he was testifying under a plea-bargain arrangement whereby he agreed to plead guilty to the reduced charge of second-degree murder and to testify truthfully in the trials against Hardy and Folston in exchange for a sentence of no more than sixty years and dismissal of the other charges against him. Kevin Green was also known as "Clyde," apparently for "Bonnie and Clyde." The initials "B & C" were tatooed on his arm.

Green indicated that the purpose of the trip to Durham was for defendant Hardy to see someone concerning the publication of a book he had written entitled "Legacy of a Black Man." After the wreck, Hardy's brief case and some papers were found strewn all over the highway. The papers and brief case were recovered by the officers and returned to Hardy.

Defendant Folston offered no evidence. Defendant Hardy offered a number of character witnesses, including the Chancellor and the Dean of Students at the University of North Carolina at Asheville, which school Hardy had attended.

Other facts necessary to the decision will be discussed in the opinion.

*Attorney General Rufus L. Edmisten by Assistant Attorney General James E. Magner, Jr., for the State.*

*J. Bruce McKinney and Claude S. Sitton for defendant Hardy.*

*H. Dockery Teele, Jr., and W. Harold Mitchell for defendant Folston.*

COPELAND, Justice.

Defendants, through counsel, moved the Court to quash the indictments against them on the ground that there was arbitrary and systematic exclusion of blacks, women, and 18 through 21 year olds from the grand and petit juries. Defendants claim the court erred by ruling that there was no evidence of arbitrary or systematic exclusion of certain classes of people from the grand or petit juries and by denying their motions to quash. In this assignment of error, we are concerned with the grand jury selection process in Burke County, the county where the bills of indictment were returned, and the petit jury selection process in Cleveland County, the county to which the cases were transferred for trial.

A defendant has the burden of establishing discrimination in the composition of the jury. *State v. Wright*, 290 N.C. 45, 224 S.E. 2d 624 (1976); *State v. Cornell*, 281 N.C. 20, 187 S.E. 2d 768 (1972). Both defendants concede that they failed to offer any evidence of discrimination against any groups in the selection of petit juries in Cleveland County. Consequently, defendants are not entitled to relief on this ground. Instead, defendants rely on evidence of alleged discrimination in the selection of Burke County *grand* juries.

In its latest pronouncement on the subject of grand jury selection, the United States Supreme Court indicated the elements that must be shown by a defendant in order to make out a *prima facie* case of discrimination against a particular group.

"[I]n order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial under-representation of his race or of the identifiable group to which he belongs. The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws as written or as applied. (Citation omitted.) Next, the degree of under-representation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time. (Citations omitted.) . . . Once the defendant has shown substantial under-representation of his group, he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the State to rebut

that case." *Castaneda v. Partida*, ----- U.S. -----, -----, 51 L.Ed. 2d 498, 510-11, 97 S.Ct. 1272, 1280 (1977); *accord, State v. Cornell, supra; State v. Ray*, 274 N.C. 556, 164 S.E. 2d 457 (1968); *State v. Wilson*, 262 N.C. 419, 137 S.E. 2d 109 (1964).

[1, 2] The only evidence presented by the defendants on their motions was the lists of the grand jurors who served terms in Burke County expiring during the years 1973 through 1976. According to defendants' calculations, during this four-year period only 14 of the 51 grand jurors who served, or 27%, were women (by our calculations only 17 of 69 grand jurors, or 25%, were women). Of those grand jurors who served during 1976 and returned the indictments upon which defendants were tried, 4 of 18, or 22%, were women. Defendants did not introduce evidence of the proportion of women in the total population of Burke County but ask us to take judicial notice "of the fact that women make up at least 50% of our population, and in fact, in most instances, constitute more than one-half of the population." The percentage of women in a given county is not properly the subject of judicial notice. Without this element of proof, defendants have failed to show *any* under-representation of women on grand juries in Burke County and no *prima facie* case of discrimination against women has been made out.

Some question arises as to whether defendants, who are all male, have any right to complain of under-representation of women on grand juries, assuming it were proven. Defendants cite us to *Taylor v. Louisiana*, 419 U.S. 522, 42 L.Ed. 2d 690, 95 S.Ct. 692 (1975), which held that a male defendant could challenge the exclusion of women from a *petit* jury. Clearly, *Taylor v. Louisiana* is distinguishable from the case at bar because the challenge was to the composition of a petit jury and the decision was bottomed on a defendant's Sixth and Fourteenth Amendment right to an impartial jury trial in a criminal case, which the United States Supreme Court interpreted to mean a trial by a representative cross section of the community. By contrast, a challenge to the composition of a grand jury is necessarily based on either a Fourteenth Amendment due process or equal protection claim. From the language of *Castaneda v. Partida, supra,* it would appear a defendant must show that he belongs to the under-represented group before he can maintain an equal protection challenge to the grand jury composition.

State v. Hardy

*But see Peters v. Kiff,* 407 U.S. 493, 33 L.Ed. 2d 83, 92 S.Ct. 2163 (1972) which indicates that a due process claim can be maintained by a nonmember of an excluded group.

[3] By the same token, we question whether a grand jury system which excluded 18 to 21 year olds would violate defendant Hardy's right to equal protection under the laws, defendant Hardy being 24 years of age at the time crimes were allegedly committed. We also have serious reservations as to whether the 18 to 21 year age group would be considered a constitutionally identifiable group under *Castaneda v. Partida, supra.* It is doubtful that every characteristic that distinguishes one group of people from another is constitutionally significant. It may be that the exclusion of a group would not render invalid an indictment by a grand jury so long as there is no reasonable basis for the conclusion that the ineligible group would bring to the jury a point of view not otherwise represented upon it. *See Taylor v. Louisiana, supra; Peters v. Kiff, supra; State v. Knight,* 269 N.C. 100, 152 S.E. 2d 179 (1967). In any event, defendants failed to introduce any evidence of the proportion of 18 to 21 year olds serving on the grand juries in Burke County or of their percentage in the population of the county.

[4] Likewise, defendants did not present evidence of underrepresentation of members of their race on the grand juries of Burke County. Defendants claim that because Burke County keeps no records of the race of the members of the jury list or of persons actually selected to serve on juries it is difficult, if not impossible, for them to meet this burden of proof. Defendants acknowledge that this record keeping system reduces the possibility of intentional racial discrimination but claim that it precludes any examination of whether the procedures are inherently discriminatory with respect to blacks.

As support, defendants cite *State v. Spencer,* 276 N.C. 535, 173 S.E. 2d 765 (1970), which held that a defendant must be allowed a reasonable time and opportunity to inquire into and present evidence of racial discrimination in jury selection. *State v. Spencer* and the cases cited therein involved denials of a defendant's motion for a continuance to gather evidence of discrimination. In the present case, defendants never moved for a continuance and apparently never attempted by any means to ascertain the racial composition of the past grand juries. Where there is absolutely no evidence presented of racial discrimination

and defense counsel has made no efforts to produce proof, this Court will not presume it. *See State v. Wright, supra; State v. Ray, supra.*

[5] Defendants argue that the trial judge erred in not making findings of fact supporting his ruling on their motions to quash. To the contrary, the court found that there was no evidence before it to indicate that the jury commission in either county had intentionally, systematically or arbitrarily discriminated against any of the groups mentioned. The court's finding was sufficiently supported by the evidence (or lack of it). Moreover, the judge is only required to make findings when the evidence is contradictory and conflicting as to material facts. *State v. Wilson, supra.* Here there were no contradictions or conflicts in the evidence presented. Defendants' evidence did not show any discrimination.

[6] Although it was not required to come forward with evidence because no *prima facie* showing of discrimination had been made, the State offered evidence tending to show that the institution and management of the jury system in both counties was not in fact discriminatory. *State v. Wilson, supra.* Letters from the jury commission in each county indicated that the statutory procedure for the selection of jurors prescribed in Chapter 9 of the General Statutes was followed. We have held that the North Carolina statutory plan for the selection of jurors is constitutional and provides a jury system completely free of discrimination to any cognizable group. *State v. Cornell, supra; State v. Wilson, supra.*

These statutes leave little to the exercise of official discretion. Although under G.S. 9-2, the jury commissions could have used sources of names other than the voter registration records and tax lists of the counties in the preparation of the lists of jurors, they did not. Both jury commissions used a neutral systematic selection procedure (e.g., every sixth name) in selecting names from the source lists as required by G.S. 9-2, and it appears that the only criteria used in striking names from the jury lists were the permissible disqualifications set out in G.S. 9-3. The trial court properly denied defendants' motions to quash and the assignment of error is overruled.

Next, defendants contend the court erred in consolidating their cases for trial and denying their motions for a severance.

[7] The State's motion for consolidation was addressed to the sound discretion of the trial judge. "Consolidation of cases for trial is generally proper when the offenses charged are of the same class and are so connected in time and place that evidence at trial upon one indictment would be competent and admissible on the other." *State v. Phifer*, 290 N.C. 203, 225 S.E. 2d 786, 790 (1976); *accord, State v. Taylor*, 289 N.C. 223, 221 S.E. 2d 359 (1976); *State v. King*, 287 N.C. 645, 215 S.E. 2d 540 (1975); G.S. 15A-926(b)(2). The trial judge's exercise of his discretion will not be disturbed absent a showing that defendant has been denied a fair trial by the order of consolidation. *State v. Taylor, supra; State v. Jones*, 280 N.C. 322, 185 S.E. 2d 858 (1972).

[8] Each defendant contends his constitutional right of confrontation as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution was violated by the reception into evidence of statements by a codefendant which implicated him in the crime charged but which were inadmissible against him because the codefendant did not take the stand. Specifically, defendants complain that witness Green's account of a conversation that he overheard between defendants Folston and Hardy when the three were incarcerated in the Caldwell County Jail was not admissible at a joint trial. The defendants and Green occupied the same cell for about a week. Over objection, Green was allowed to testify that,

> "The conversation was more or less about the money. Mr. Hardy asked Mr. Folston why he did shoot the man and Mr. Folston gave no reply. Mr. Folston did not say anything when Mr. Hardy asked him why he shot the man."

Defendant Folston argues that Hardy's statement (actually a question) implicated him and was inadmissible hearsay as to him.

Witness Green was also permitted to testify over objection as follows:

"Q: Mr. Folston said what?

A: Mr. Hardy told him you had to kill the victim or he would testify."

Defendant Hardy argues that defendant Folston's statement inculpated him and was inadmissible hearsay as to him.

Both defendants rely upon *Bruton v. United States*, 391 U.S. 123, 20 L.Ed. 2d 476, 88 S.Ct. 1620 (1968), which held that the admission in a joint trial of a codefendant's confession implicating a defendant violates the non-confessing defendant's Sixth Amendment right of confrontation unless the confessor takes the stand so as to be subjected to cross-examination, notwithstanding instructions to the jury that the codefendant's confession is not to be considered in determining the accused's guilt or innocence. *Pointer v. Texas*, 380 U.S. 400, 13 L.Ed. 2d 923, 85 S.Ct. 1065 (1965) held that the Sixth Amendment right of an accused to confront witnesses against him is a fundamental right, made obligatory on the states by the Fourteenth Amendment. The rule as stated in *Bruton* applies equally to *admissions* by a codefendant that implicate another defendant against whom the evidence is inadmissible. *State v. Spaulding*, 288 N.C. 397, 219 S.E. 2d 178 (1975); *see Bruton v. United States, supra.*

In interpreting *Bruton, supra*, our Court has held:

"[i]n joint trials of defendants it is necessary to exclude extrajudicial confessions unless all portions which implicate defendants other than the declarant can be deleted without prejudice either to the State or the declarant. If such deletion is not possible, the State must choose between relinquishing the confession or trying the defendants separately. The foregoing pronouncement presupposes (1) *that the confession is inadmissible as to the codefendant* (Citation omitted), and (2) that the declarant will not take the stand. If the declarant can be cross-examined, a codefendant has been accorded his right to confrontation. (Citation omitted.)" (Emphasis supplied.) *State v. Fox*, 274 N.C. 277, 291, 163 S.E. 2d 492, 502 (1968); *accord*, G.S. 15A-927 (c)(1).

But where the incriminating admissions of a nontestifying codefendant are admissible against the defendant under well-recognized rules of evidence, the *Bruton* choice, does not present itself. *State v. Spaulding, supra; see Bruton v. United States, supra* at 128 n. 3, 20 L.Ed. 2d at 480 n. 3, 88 S.Ct. at 1623 n. 3. In the case at bar, the statements complained of were admissible as implied admissions.

"Implied admissions are received with great caution. However, if the statement is made in a person's presence by a person having firsthand knowledge under such circum-

stances that a denial would be naturally expected if the statement were untrue and it is shown that he [the defendant] was in a position to hear and understand what was said and had the opportunity to speak, then his silence or failure to deny renders the statement admissible against him as an implied admission. (Citations omitted.)" *State v. Spaulding, supra* at 406, 219 S.E. 2d at 184.

The evidence shows that during the prison cell conversation concerning the money, both defendants were present, both were in a position to hear and understand the statements by their codefendants and both had the opportunity to speak. Clearly, the statements objected to were of such a nature that a denial would naturally be expected to be forthcoming if the statements were untrue. Defendants' motions for a severance were properly denied and the assignments of error related thereto are overruled.

[9] Both defendants contend the court failed to properly instruct the jury in accordance with G.S. 15A-1052(c) before receiving the testimony of witness Green.

G.S. 15A-1052(c) provides as follows:

"In a jury trial the judge must inform the jury of the grant of immunity and the order to testify prior to the testimony of the witness under the grant of immunity. During the charge to the jury, the judge must instruct the jury as in the case of interested witnesses."

The record discloses that before any witnesses were called in the case, Judge Friday instructed the jury as follows:

"Members of the jury, it's the Court's duty to instruct you that in the event Kevin Michael Green testifies, he will be testifying under a grant of immunity, the terms of which have been previously explained to you. That is, he would receive no more than sixty (60) years in the North Carolina Department of Corrections, and he would be allowed to plead Guilty to second degree murder. The Court will instruct you later on an accomplice's testimony."

First, defendants complain that this instruction did not comply with G.S. 15A-1052 because it was not given *immediately* preceding Green's testimony. Nothing in the statute requires the instruction to be given immediately before the witness's

testimony. The statute only specifies that the instruction be given "prior" to the testimony. We believe Judge Friday's instruction complied with the spirit as well as the letter of the law.

Next, defendants point out that Judge Friday's instruction did not give all the terms of witness Green's grant of immunity. The statute requires the trial judge to inform the jury "of the grant of immunity" and not the details of the grant. Obviously, the legislature intended for the jury to know the witness was receiving something of value in exchange for his testimony which might bear on his credibility. Where, as here, the material terms of the grant of immunity are explained to the jury, there is substantial compliance with the statute and no prejudicial error.

[10] Defendant Hardy additionally contends the judge should have instructed the jurors, prior to Green's testimony, that Green was an interested witness whose testimony should be carefully scrutinized by them. G.S. 15A-1052(c) clearly requires the court to so instruct the jury but "during the charge to the jury." We interpret this language to mean during the judge's *final* charge and not in advance of the witness's testimony. In his final charge Judge Friday instructed the jury as follows:

"Now, Ladies and Gentlemen of the Jury (A) there is evidence in these cases which tends to show that the witness, Green, is testifying under an agreement with the prosecutor for a charge reduction in exchange for his testimony; and under agreement with the prosecutor for recommendation for sentence concession in exchange for his testimony, as the Court earlier stated to you. If you find this witness, Green, testified in whole or part from these reasons you should examine this testimony with great care and caution in deciding whether or not to believe it. (B) If, after doing so, you believe his testimony in whole or in part, you should treat what you believe the same as any other believable evidence in the case. (C) There is evidence which tends to show that the witness, Green, was an accomplice in the commission of the crime charged in this case, Ladies and Gentlemen. An accomplice may actually take part in acts necessary to accomplish the crime, and he may knowingly help and encourage another either before or during its commission. An accomplice is considered by law to have

an interest in the outcome of the case. He is considered to be an interested witness. If you find the witness, Green, to be an accomplice, (D) you should examine every part of his testimony with the greatest care and caution; and if after doing so, you believe his testimony in whole or in part, you should treat what you believe the same as any other believable evidence in this case."

[11] In a related assignment of error, defendants argue that this instruction was erroneous because (1) it required the jury to first find that witness Green was an accomplice and (2) it did not define accomplice. Defendants contend the trial court should have instructed the jury that Green was an accomplice because all of the State's evidence tended to show he was an accomplice. At the very least, defendants contend the court should have defined accomplice so as to enable the jury to make the finding.

In *State v. Harris,* a case on point, we held that "when all of the evidence shows a witness to be an accomplice, then the trial judge should instruct that the witness's testimony should be carefully scrutinized, without requiring any finding by the jury." *State v. Harris,* 290 N.C. 681, 699, 228 S.E. 2d 437, 447 (1976); *see also State v. Bailey,* 254 N.C. 380, 119 S.E. 2d 165 (1961). Having said this, we further noted that "[w]hile this type of instruction would have been proper in the case before us, it must be borne in mind that every poorly stated instruction does not result in such prejudice as to require a new trial. In order to constitute reversible error, it must be made to appear that, in light of all the facts and circumstances, the challenged instruction might reasonably have had a prejudicial effect on the result of the trial." *State v. Harris, supra* at 699-700, 228 S.E. 2d at 447. In *Harris* we found the error nonprejudicial and we are of the same opinion in this case.

We are certain that defendants did not consider the instruction given prejudicial because it appears of record that the instruction on accomplice testimony tendered by *defendants* would have required the jury to make the finding that the witness was an accomplice: N.C.P.I.—Crim. 104.25 (Oct. 1974). Thus any error in the judge's charge was invited by defendants.

Defendants' claim that the court should have defined accomplice is without merit. Judge Friday did define accomplice. Moreover, his definition was in substantial conformity with the

definition requested by defendants and was not required to be identical. *State v. Bailey, supra.*

The assignments of error relating to the judge's instructions on accomplice testimony and immunity grants are overruled.

In defendants' next assignment of error, they claim the court erred in failing to strike the testimony of Vernon Robert Fragiacomo or to grant a mistrial for the failure of the State to provide a prior recorded statement of the witness as per a pretrial discovery order. The discovery order was entered by Superior Court Judge Bruce B. Briggs on 20 November 1975, after defendants moved for discovery pursuant to G.S. 15A-903.

Judge Briggs' order, among other things, required the State to allow the defendants to examine, inspect, copy, or photograph the following:

"5. Other papers, documents, photographs, mechanical or electronic recordings, tangible objects in control of the State relative to said case."

G.S. 15A-903(d), upon which the order was apparently based, provides as follows:

"Documents and Tangible Objects.— Upon motion of the defendant, the court must order the solicitor to permit the defendant to inspect and copy or photograph books, papers, documents, photographs, motion pictures, mechanical or electronic recordings, tangible objects, or copies or portions thereof which are within the possession, custody, or control of the State and which are material to the preparation of his defense, are intended for use by the State as evidence at the trial, or were obtained from or belong to the defendant."

The official commentary to G.S. 15A-903 interprets this subsection to allow discovery of:

"(5) Books, papers, documents, photographs, motion pictures, mechanical or electronic recordings, and tangible objects in the control of the State and which are:

a. Material to the preparation of the defense; or

b. Intended for use by the State as evidence; or

c. Were obtained from or belong to the defendant." Official Commentary, G.S. 15A-903 (1975).

In the course of Fragiacomo's testimony, at trial, a *voir dire* examination was held of Deputy Sheriff Sam Williams. The deputy revealed that Fragiacomo's statement was recorded on tape and a transcript of the statement furnished to the district attorney. Neither the recording nor the transcript was ever furnished to the defense. Defense counsel argued that the recording should have been disclosed as per the discovery order and moved that Fragiacomo's testimony be stricken from the record or that a mistrial be declared. The district attorney, out of the presence of the jury, adamantly stated that he would not allow defendants to hear the recording or read the transcript. He threatened to resign if the law of the State compelled him to turn over the tape or the transcript and indicated that all the other district attorneys in the State would do likewise. At length, the district attorney argued that neither the law nor Judge Briggs' order authorized discovery of the statement in question. Unfortunately, the district attorney's argument exceeded the bounds of propriety and was not restrained by the trial judge. Ultimately, Judge Friday ruled the recording and transcript were the "work product" of the State and denied the defendants' motions.

On appeal, the State contends that G.S. 15A-903 does not require disclosure of Fragiacomo's recorded statement because (1) it was not used during the trial of the case and (2) Fragiacomo was neither a defendant nor a codefendant. The State further contends that the order of Judge Briggs exceeded his authority under G.S. 15A-903 and thus, was a nullity. Defendants maintain that both the order and G.S. 15A-903 required the disclosure.

[12] As to Judge Briggs' pretrial discovery order, the State correctly observed that if the order contemplated pretrial discovery by a defendant of a prosecution witness's prior statements, the order exceeded the judge's authority. The State is correct, however, for the wrong reason. Standing alone, G.S. 15A-903(d) would allow discovery of Fragiacomo's recorded statement. On its face, G.S. 15A-903(d) would permit the discovery of any recorded or written statement that is material to the preparation of the defense, as defendants now contend. However, we are not permitted to stop here but must construe the statutory scheme in its entirety. The very next section, G.S. 15A-904, limits G.S. 15A-903 and is dispositive of the issue of

prosecution witnesses' statements. G.S. 15A-904(a) provides as follows:

"Except as provided in G.S. 15A-903(a)(b)(c) and (e), this Article does not require the production . . . of statements made by witnesses or prospective witnesses of the State to anyone acting on behalf of the State."

Notably lacking from the list of subsections excluded from the scope of G.S. 15A-904(a) is subsection d of G.S. 15A-903. G.S. 15A-904(a) is consistent with the legislature's desire, elsewhere expressed, to have the identity of State's witnesses shielded prior to trial. In the original bill, for example, the legislature rejected a proposal that would have allowed defendants to discover the names, addresses, and criminal records of witnesses the State intended to call, apparently, because witnesses may easily be subjected to harassment or intimidation. Official Commentary, G.S. 15A-903 (1975). *See also State v. Smith,* 291 N.C. 505, 231 S.E. 2d 663 (1977).

[13] The question arises whether Judge Briggs had the *inherent* power to order pretrial discovery of a witness's statements. No right to pretrial discovery existed at common law. *State v. Carter,* 289 N.C. 35, 220 S.E. 2d 313 (1975); *State v. Hoffman,* 281 N.C. 727, 190 S.E. 2d 842 (1972); *State v. Goldberg,* 261 N.C. 181, 134 S.E. 2d 334, *cert. denied,* 377 U.S. 978, 12 L.Ed. 2d 747, 84 S.Ct. 1884 (1964). However, the absence of discovery as a matter of right does not necessarily preclude the trial judge from ordering discovery in his discretion. R. Farb, *Overview of Criminal Discovery in North Carolina,* Administration of Justice Memoranda, September 17, 1976 (published by the Institute of Government, University of North Carolina at Chapel Hill). This question is apparently unresolved by this Court. *But see State v. Carter, supra; State v. Hoffman, supra* (for cases in which discovery orders, not authorized by statute, were entered by the trial judge without comment by this Court); *State v. Smith, supra* (for a case in which the Court expressly discouraged a pretrial order requiring the State to furnish the names and addresses of its witnesses).

A preliminary draft of proposed amendments to Rule 16 of the Federal Rules of Criminal Procedure served as the model for the drafting of Article 48 of Chapter 15A of the General Statutes. Official Commentary, G.S. Ch. 15A, Art. 48 (1975). The Federal courts, in construing Rule 16, have recognized the

judiciary's inherent power to compel pretrial discovery where not specifically prohibited by Rule 16. *E.g., United States v. Cannone*, 528 F. 2d 296 (2d Cir. 1975); *United States v. Jackson*, 508 F. 2d 1001 (7th Cir. 1975).

On the facts of this case, it is not necessary for us to reach the question of whether North Carolina trial judges have the inherent power to order pretrial discovery in the absence of a statute prohibiting discovery. We do decide that where a statute expressly restricts pretrial discovery, as does G.S. 15A-904(a), the trial court has no authority to order discovery. Our holding is in accordance with the Federal courts' interpretation of their analogous provisions found in Rule 16 and the Jencks Act. *United States v. Percevault*, 490 F. 2d 126 (2d Cir. 1974); *e.g., United States v. McMillen*, 489 F. 2d 229 (7th Cir. 1972); *cert. denied*, 410 U.S. 955 (1973); Fed. R. Crim. P. 16, 18 U.S.C.; The Jencks Act, 18 U.S.C. § 3500.

[14] We do not construe paragraph 5 of Judge Briggs' order to be in excess of his authority but rather interpret it as ordering discovery of only those materials defendants are permitted to receive under G.S. 15A-903(d), as limited by G.S. 15A-904(a). Thus, Fragiacomo's statement was not discoverable *prior* to trial under either the statute or Judge Briggs' order.

A question remains as to the trial court's power to order discovery *at trial*. In *United States v. Nobles*, 422 U.S. 225, 45 L.Ed. 2d 141, 95 S.Ct. 2160 (1975), the United States Supreme Court held that Rule 16 applies only to pretrial discovery and thus the trial judge may order discovery during trial of material specifically exempted from discovery before trial by Rule 16. Similarly, we hold that G.S. 15A-904(a) does not bar the discovery of prosecution witnesses' statements *at trial*.

At trial, the identity of the State's witnesses is known and thus disclosure of their prior statements does not subject them to any additional risks. At trial the major concern is the "search for truth" as it is revealed through the presentation and development of all relevant facts. To insure that truth is ascertained and justice served, the judiciary must have the power to compel the disclosure of relevant facts, not otherwise privileged, within the framework of the rules of evidence. *United States v. Nobles, supra.*

[15] Apparently, Judge Friday felt himself constrained in this case from ordering disclosure by the work product doctrine.

The work product doctrine applies in criminal as well as civil cases. *State v. Davis*, 282 N.C. 107, 191 S.E. 2d 664 (1972); G.S. 15A-904, -906. It is a qualified privilege for certain materials prepared by an attorney acting on behalf of his client in anticipation of litigation. *United States v. Nobles, supra; Hickman v. Taylor*, 329 U.S. 495, 91 L.Ed. 451, 67 S.Ct. 385 (1947); E. Cleary, McCormick on Evidence 204-09 (2d Ed. 1972); 1 Stansbury's N.C. Evidence § 62 (Brandis Rev. 1973 and Supp. 1976); Annot., 35 A.L.R. 3d 412. The doctrine has been extended to protect materials prepared for the attorney by his agents as well as those prepared by the attorney himself. *United States v. Nobles, supra.*

The doctrine was designed to protect the mental processes of the attorney from outside interference and provide a privileged area in which he can analyze and prepare his client's case. *United States v. Nobles, supra.* Only roughly and broadly speaking can a statement of a witness that is reduced verbatim to a writing or a recording by an attorney be considered work product, if at all. It is work product only in the sense that it was prepared by the attorney or his agent in anticipation of trial (in this case, by the police for the district attorney). Such a statement is not work product in the same sense that an attorney's impressions, opinions, and conclusions or his legal theories and strategies are work product.

[16]    As pointed out in *United States v. Nobles, supra*, the work product privilege, like any other qualified privilege, can be waived. The privilege is certainly waived when the defendant or the State seeks at trial to make a testimonial use of the work product. By electing to use Fragiacomo as a witness the State waived any privilege it might have had with respect to matters covered in his testimony. *United States v. Nobles, supra.*

Counsel for defendants call our attention to *Brady v. Maryland*, 373 U.S. 83, 87, 10 L.Ed. 2d 215, 218, 83 S.Ct. 1194, 1196-97 (1963), which held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Accord, State v. Gaines*, 283 N.C. 33, 194 S.E. 2d 839 (1973). Obviously, the corollary to this constitutional holding, is that the prosecutor has the *duty* to disclose such evidence to a

defendant. Nakell, *Criminal Discovery for the Defense and the Prosecution — The Developing Constitutional Considerations,* 50 N.C.L.Rev. 437, 452 (1972) (hereinafter cited as "Nakell").

[17]　Recently, *United States v. Agurs,*-----U.S.-----, 49 L.Ed. 2d 342, 96 S.Ct. 2392 (1976), resolved several of the questions left unanswered by *Brady. See* Comment, *Brady v. Maryland and the Prosecutor's Duty to Disclose,* 40 U. Chi. L. Rev. 112, 115-131 (hereinafter cited as "Comment"). Under *Agurs,* it appears the prosecutor is constitutionally required to disclose only *at trial* evidence that is favorable and material to the defense. Due process is concerned that the suppressed evidence might have affected the outcome at trial and not that the suppressed evidence might have aided the defense in preparing for trial. *United States v. Agurs, supra.* For the *Brady* standard to apply, a specific request for the evidence must have been made because a general request for all favorable and material evidence is no more efficacious than no request in alerting the prosecution to the materials sought. *United States v. Agurs, supra.*

Neither *Agurs* nor *Brady* addresses the question of who should decide when the evidence is material and favorable. The lower courts as a general rule have left the initial determination of whether evidence is both material and exculpatory to the prosecutor, although some have required evidence to be submitted to *in camera* inspection by the trial judge. Nakell, *supra* at 453; Comment, *supra* at 120-21.

Several objections to having the judge decide when disclosure of evidence is necessary, as a matter of due process, have been raised. First, the judge is ordinarily less oriented to the facts of the case and possible defenses than is the prosecuting attorney. Second, requiring the judge to review prosecution files for information useful to the defendant casts the judge in a defense advocate's role. Third, it is time consuming of judicial resources for the judge to sift through prosecution files. Nakell, *supra* at 460-61; Comment, *supra* at 120; Note, 74 Yale L.J. 136, 148-49 (1964).

[18]　While all of these considerations are valid when the defense makes a general request for a fishing expedition, we believe justice requires the judge to order an *in camera* inspection when a specific request is made at trial for disclosure of evidence in the State's possession that is obviously relevant, compe-

tent and not privileged. The relevancy for impeachment purposes of a prior statement of a material State's witness is obvious.

We do not hold as the United States Supreme Court has held, as a matter of federal criminal procedure, that a defendant is automatically entitled to such statements at trial. *Jencks v. United States*, 353 U.S. 657, 1 L.Ed. 2d 1103, 77 S.Ct. 1007 (1957), a holding that Congress subsequently approved and codified in the Jencks Act, 18 U.S.C. § 3500. *State v. Chavis*, 24 N.C. App. 148, 210 S.E. 2d 555 (1974), *cert. denied*, 287 N.C. 261, 214 S.E. 2d 434 (1975), *cert. denied*, 423 U.S. 1080 (1976).

Instead, we hold that since realistically a defendant cannot know if a statement of a material State's witness covering the matters testified to at trial would be material and favorable to his defense, *Brady* and *Agurs* require the judge to, at a minimum, order an *in camera* inspection and make appropriate findings of fact. As an additional measure, if the judge, after the *in camera* examination, rules against the defendant on his motion, the judge should order the sealed statement placed in the record for appellate review. Such a procedure has been employed in North Carolina by former Superior Judge Robert Martin (now a member of the N. C. Court of Appeals). *State v. Chavis, supra* at 176-84, 210 S.E. 2d at 574-78. See Annot., 7 A.L.R. 3d 181 (1966) for the rule in other states.

[19] In the present case, we find that Judge Friday's rulings on defendants' motions were not error. Defendants never requested disclosure of witness Fragiacomo's statement at trial nor did they ask for a sealed transcript to be placed in the record for appellate review even though Deputy Sheriff Williams testified that he had in his possession a copy of the transcript. Defendants moved the court to completely strike the witness's testimony or to declare a mistrial because the State did not comply with the pretrial discovery order. As previously noted, the State was not required to divulge the statement prior to trial.

On the basis of this record, we cannot say that defendants' constitutional rights were violated. We have no reason to believe that Fragiacomo's recorded statement was favorable to the defense and we decline to award defendants a new trial on the basis of pure supposition when they never attempted to have the statement placed in the record for our consideration. The assignment of error is overruled.

Both defendants assign as error the trial court's denial of their motions for nonsuit. Defendant Folston concedes, however, that when the evidence is viewed in the light most favorable to the State, as it must be, there was sufficient evidence of all elements of the offense charged to submit his case to the jury. In light of the testimony of the two eyewitnesses, Green and Fragiacomo, who observed Folston's participation in the crimes, we agree.

[20] Defendant Hardy, on the other hand, was never in the service station during the commission of the armed robbery and murder and contends his case should have been nonsuited. The evidence for the State and defendant Hardy's own evidence tended to show: (1) Hardy was the only adult and the oldest member of the group (5 years older than Folston and 7 years older than Green); (2) He was a friend of Green and Folston and asked them to accompany him to Durham; (3) He was a leader among black students at the University of North Carolina at Asheville; (4) Hardy switched his car in Asheville for his sister's car; (5) The sister's car had a phony license plate (some time before the car was wrecked, the lawful license plate had been removed and another plate substituted therefor. The lawful plate was found under the front seat); (6) Before leaving Asheville, Hardy placed his shotgun in his sister's car; (7) At the service station, Hardy ordered Fragiacomo into the car and threatened him with the same fate as the murdered service station attendant; (8) In the car, Hardy said that the reason the incident at the filling station had occurred was because the black man was "sick and tired of being opposed or stepped on"; (9) Hardy told Folston that when the police officer approached the vehicle and asked for his driver's license, "he would have to shoot him"; (10) Hardy drove away from police after the car had been stopped and he was ordered to place his hands on the dash board; (11) A shotgun and several pistols were found in the automobile after the wreck; (12) Hardy ran from police after the wreck; (13) In jail, Folston stated that Hardy told him he had to kill the victim or he would talk. These facts when combined with other facts in evidence showing that Folston entered the station, robbed and killed the station attendant in the plain view and hearing of Hardy, permit the reasonable inference that Hardy not only participated in the planning and execution of the robbery and murder, but also that he masterminded and directed it. The State is entitled to

have all favorable evidence and all reasonable inferences arising thereon considered on the motion for nonsuit. *State v. Harding*, 291 N.C. 223, 230 S.E. 2d 397 (1976); *State v. Bowden*, 290 N.C. 702, 228 S.E. 2d 414 (1976). The evidence and the reasonable inferences drawn from it were sufficient to withstand the motion for nonsuit. These assignments of error are overruled.

[21] Finally, defendants contend the court erred in sentencing them to death because the death penalty is unconstitutional. In *Woodson v. North Carolina*, 428 U.S. 510, 49 L.Ed. 2d 944, 96 S.Ct. 2978 (1976), the United States Supreme Court invalidated the death penalty provisions of G.S. 14-17 (Cum. Supp. 1975) under which defendants were indicted, convicted, and sentenced to death. Our Court is authorized to substitute life imprisonment for the death penalty by authority of the provisions of 1973 Sess. Laws, c. 1201 § 7 (1974 Session). *State v. Cousin*, 291 N.C. 413, 230 S.E. 2d 518 (1976).

This case is remanded to the Superior Court of Cleveland County with directions (1) that the presiding judge, without requiring the presence of defendants, enter a judgment as to each defendant imposing life imprisonment for the first-degree murder of which defendants have been convicted; and (2) that, in accordance with these judgments, the clerk of superior court issue commitments in substitution for the commitments heretofore issued. It is further ordered that the clerk furnish to the defendants and their attorneys a copy of the judgments and commitments as revised in accordance with this opinion.

We have carefully examined Hardy's Assignments of Error Nos. 3, 5, 8, 11, 12, 13, and defendant Folston's Assignments of Error Nos. 3, 5, 6, 11, 12, 13, 18, 19, and find them to be either without error, or without prejudicial error. Errors, if errors there be, were harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 17 L.Ed. 2d 705, 87 S.Ct. 824 (1967). In addition, due to the serious nature of this case, we have searched the record for errors other than those assigned by the defendants and have found none.

As a final matter, we consider some irregularities in the appointment of counsel in this case. First, the documentation of these appointments is skimpy at best. Apparently, J. Bruce McKinney was appointed on 6 August 1975 to represent defendant Hardy who was found to be indigent. Later, Claude

S. Sitton was retained as private counsel for defendant Hardy on 20 August 1975. We note that, at that time, the court should have relieved Mr. McKinney from his duties as counsel for defendant Hardy. "The question of indigency may be determined or redetermined by the court at any stage of the action or proceeding at which an indigent is entitled to representation." G.S. 7A-450(c). "It is not the public policy of this State to subsidize any portion of a defendant's defense which he himself can pay." *State v. Hoffman,* 281 N.C. 727, 738, 190 S.E. 2d 842, 849-50 (1972); *See* G.S. 7A-455(a).

The record on appeal indicates that both John H. McMurray and Gary Triggs were first appointed to represent defendant Folston, although the only order on file shows that Superior Court Judge Sam Ervin, III, appointed Attorney McMurray as counsel for Folston on 26 August 1975. Apparently, on 29 January 1976, Attorneys McMurray and Triggs were allowed to withdraw as counsel for defendant Folston and, on the same day, W. Harold Mitchell and H. Dockery Teele were appointed to represent defendant Folston.

[22] By orders, signed by Judge Friday on 20 June 1976, Attorneys Sitton and McKinney were appointed to represent defendant Hardy on appeal and Attorneys Mitchell and Teele were appointed to represent defendant Folston on appeal. We believe that, in the interest of the best utilization of the resources of this State, only *one* competent attorney should have been appointed to represent each indigent defendant in this case.

In the trial we find .

No error.

Death sentences vacated and, in lieu thereof, life sentences imposed.

Justice LAKE concurs in result.